No. 55,083

SANDRA J. MEDLING, a/k/a SANDRA J. FULLER, *Appellant,* v. WECOE CREDIT UNION, a Kansas Corporation, *Appellee.*

(678 P.2d 1115)

Opinion filed February 18, 1984.

*Michael L. Smith,* of Covell, Mellott, Smith & Harvey, of Shawnee Mission, was on the brief for appellant.

*Wilson E. Speer* and *Mary Stuckey Cofran,* of Speer, Austin, Holliday & Ruddick, Chartered, of Olathe, were on the brief for appellee.

The opinion of the court was delivered by

McFARLAND, J.: This action arises from the repossession of an automobile and is brought under the Uniform Consumer Credit Code (UCCC), K.S.A. 16a-1-101 *et seq.* Plaintiff Sandra J. Medling contends defendant Wecoe Credit Union acted unlawfully in repossessing and selling her 1979 Ford Thunderbird. The credit union counterclaimed for a deficiency judgment. Following a bench trial, the district court held in favor of defendant credit union on plaintiff's petition and on defendant's counterclaim. Plaintiff appeals therefrom.

The first issue is whether there is substantial competent evidence to support the trial court's finding the December, 1979, repossession of the automobile was lawful.

The rules relative to appellate court review, where sufficiency of the evidence is challenged, were summarized in *Bell v. Tilton,* 234 Kan. 461, 674 P.2d 468 (1983), as follows:

"Where a trial court has made findings of fact and conclusions of law, the function of an appellate court is to determine whether the findings are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. *In re Estate of Phillips,* 4 Kan. App. 2d 256, 261, 604 P.2d 747, *rev. denied* 227 Kan. 927 (1980); and *City of Council Grove v. Ossmann,* 219 Kan. 120, 546 P.2d 1399 (1976). It is not the function of an appellate court to weigh conflicting evidence, pass on the credibility of witnesses, *English Village Properties, Inc. v. Boettcher & Lieurance Constr. Co.,* 7 Kan. App. 2d 307, Syl. ¶ 2, 640 P.2d 1282, *rev. denied* 231 Kan. 799 (1982), or redetermine questions of fact. Where a trial judge, sitting as a trier of facts, makes a specific finding of fact on apparently conflicting or actually conflicting evidence, an appellate court is concerned only with evidence that supports the trial court's findings and not with evidence that might have supported contrary findings. *Steele v. Harrison,* 220 Kan. 422, Syl. ¶ 1, 552 P.2d 957 (1976); *Arnette*

*v. Arnette,* 162 Kan. 677, 681, 178 P.2d 1019 (1947); and *In re Estate of Phillips,* 4 Kan. App. 2d at 261-62. In other words, an appellate court searches the record for the purpose of determining whether there is any substantial competent evidence to support the findings and verdict. If so, the appellate court will not weigh the evidence. Findings of fact determined on conflicting evidence are conclusive. *Winn v. Sampson Construction Co.,* 194 Kan. 136, 142, 398 P.2d 272 (1965). See also *Klinzmann v. Beale,* 9 Kan. App. 2d 20, Syl. ¶ 10, 670 P.2d 67 (1983).

"Substantial competent evidence has been defined as evidence possessing something of substance and relevant consequence and which furnishes substantial basis of fact from which issues can reasonably be resolved. *Rush v. King Oil Co.,* 220 Kan. 616, 618, 556 P.2d 431 (1976). Even if findings of the trial judge appear to be inconsistent, the decision of the trial court may be sustained on the basis of those findings which allow the conclusion reached by the court below, if they are supported by the evidence. *Landrum v. Taylor,* 217 Kan. 113, 117, 535 P.2d 406 (1975); and *In re Estate of Phillips,* 4 Kan. App. 2d at 262." 234 Kan. at 468-69.

Plaintiff challenges the sufficiency of the evidence supporting the trial court's finding the defendant credit union properly declared the consumer credit transaction loan in default on the basis the prospect of payment, performance, or realization of collateral was significantly impaired.

The May 31, 1979, security agreement herein provides, in relevant part:

"EVENTS OF DEFAULT ENTITLING SECURED PARTY (THE CREDIT UNION) TO REPOSSESS. It is agreed by the parties hereto that the following events do reasonably constitute default which entitles the credit union to repossess collateral covered by this Security Agreement.

"(1) Default for ten (10) days for failure to make any payment as required by agreement with the credit union; and failure of the debtor to cure the default within twenty (20) days following the mailing of Notice of Consumers Right to Cure Default of Required Payment in the form and manner required by law;

"(2) Subsequent defaults of any required payment.

"(3) *Significant impairment of the prospect of payment by the Debtor;*

"(4) *Significant impairment of the prospect of performance by the Debtor of any of the agreements herein;*

"(5) Significant impairment of the realization of collateral by the Debtor by any of the following acts or omissions:

"(a) Failure of the Debtor to fulfill any of his agreements provided for herein;

"(b) Any warranty, representation or statement concerning the collateral made or furnished to the credit union by or on behalf of the Debtor which proves to have been false in any material respect when made or furnished;

"(c) Loss, theft, substantial damage, destruction, sale or encumbrance to or of any collateral, or the making of any levy seizure attachment thereof or thereon;

"(d) Death, insolvency, business failure, appointment of a receiver for any part of the property of assignment for the benefit of creditors by, or the commencement of any proceedings under any bankruptcy or insolvency laws by or against Debtor or any guarantor, co-maker, endorser or surety for or with Debtor.

"REPOSSESSION AND OTHER REMEDIES. Upon any such default, or any other significant impairment of collateral not herein described, the credit union may declare all obligations secured hereby immediately due and payable and shall have the remedies of a secured party under the law of this state.

"The Credit Union shall have the right to remove the collateral described herein from the premises without legal process and the borrowing member hereby waives and releases the credit union from and of any and all claims in connection therewith are [sic] rights therefrom, and the borrowing member further agrees upon the request of the credit union to assemble the collateral, and make it available to the credit union at a place designated by the credit union and reasonably convenient to both parties.

. . . .

"The parties to this agreement expressly agree that this transaction is subject to the provisions of Kansas law known as the Uniform Consumer Credit Code and specifically designated as K.S.A. 16a-1-101 through 16a-9-102 inclusive." (Emphasis supplied.)

K.S.A. 16a-5-109 statutorily defines and limits default for consumer credit transactions under the UCCC as follows:

"An agreement of the parties to a consumer credit transaction with respect to default on the part of the consumer is enforceable only to the extent that

"(1) the consumer fails to make a payment as required by agreement; or

"(2) *the prospect of payment, performance, or realization of collateral is significantly impaired; the burden of establishing the prospect of significant impairment is on the creditor.*" (Emphasis supplied.)

See generally New Topic Ser. Am. Jur. 2d, Consumer Protection § 314; Annot., Construction and Effect of the Uniform Consumer Credit Code, 86 A.L.R.3d 317.

The parties agree plaintiff was current on her payments at the time default was declared and the repossession occurred in December, 1979. The trial court found the prospect of payment, performance or realization of collateral was significantly impaired and that repossession was therefore lawful pursuant to K.S.A. 16a-5-109(2).

The facts supporting such finding are as follows. On May 31, 1979, plaintiff (then Sandra J. Fuller) obtained a consumer credit loan for $6,500.00 from defendant credit union. The loan was for the purchase of a 1979 Ford Thunderbird automobile. The loan was secured by a security agreement which listed the Thunderbird as collateral along with a 1974 pickup truck. Ronald L. Fuller, plaintiff's then husband, was a cosigner of the security agreement. The purchase of the Thunderbird increased plaintiff's existing indebtedness at the credit union to $12,440.50.

Interest was 12 percent per annum. Monthly payments were increased to $327.60 commencing June 30, 1979.

In May, 1979, Sandra Medling was employed by Western Electric Company at its plant in Johnson County, Kansas. The employees of this plant had established Wecoe Credit Union for their use. The credit union was owned by the employees of Western Electric in Johnson County, not by the company. There were approximately five hundred employees who had access to the credit union. Additionally, employee family members could use the credit union. One of the loan features of the credit union was employees could pay off their debts to the credit union by automatic payroll deductions. Plaintiff's $327.60 monthly payments were to be paid to the credit union through this automatic payroll deduction scheme.

In August, 1979, plaintiff and Ronald Fuller were divorced. A month later, September, 1979, plaintiff married Victor F. Medling. On November 27, 1979, plaintiff went to the credit union and visited with Mr. Max Erath, President of Wecoe. Plaintiff advised Mr. Erath she would be terminating her employment with Western Electric on January 4, 1980, and would then be moving to Michigan. Plaintiff further advised Mr. Erath she should be receiving an $8,000.00 tax refund and she would apply all of this to her debt. Plaintiff also wrote out her new address for Mr. Erath in Michigan as follows:

> "Sandra Medling       —268-6211
> 7619 Monrovia Lane
> Shawnee, Kansas 66216
> % Arn Haynes
> 200 Canter Lane
> Holly, Michigan"

Mr. Erath's notes of the conversation additionally reflected:

> "11-27-79   am
>                  Ext.
> Sandra Fuller      6102
> Payment 327.60    Loan Bal. 11209.67
>        Leaving date 1-4-80
> Plans to apply approx. $8,000 before
>       Leaving.
> Who has 79 Ford      She has
>  "    "   74 Chev PU      He has"

Instead of terminating her employment as of January 4, 1980, plaintiff quit her Western Electric job immediately after the November 27, 1979, conversation with Mr. Erath. Upon learning plaintiff was no longer employed by Western Electric, Mr. Erath telephoned plaintiff on December 3, 1979. Plaintiff advised Mr. Erath she would come in to discuss her loan the same day but did not appear. The following day Mr. Erath again telephoned plaintiff who advised him she would be in to discuss her loan the same day. She did not appear. This same scenario occurred on December 5 and 7, 1979. Meanwhile Mr. Erath's attempts to check out the Michigan address were unsuccessful. Additionally, there were questions relative to whether the cosigner (plaintiff's ex-husband, Ronald L. Fuller) was still employed and whether he continued to be a Kansas resident.

By December 7, 1979, although plaintiff was current on her loan payments, concern at the credit union over the loan was deepening. Among the factors causing anxiety to the credit union were:

1. Inability to get plaintiff to come in and discuss her loan, despite the four attempts.
2. Inability to get plaintiff to clarify her statements regarding a possible move to Michigan.
3. As of then, unsuccessful attempts to check out the Michigan address plaintiff had given the credit union in writing on November 27, 1979.
4. Status of cosigner's employment and whether he was still in Kansas.
5. Knowledge plaintiff was now unemployed.
6. As plaintiff had quit her employment at Western Electric, the credit union no longer enjoyed payment by automatic payroll deductions.
7. A growing fear plaintiff was about to leave Kansas with the 1979 Thunderbird which was the principal collateral securing the credit union's loan.
8. The amount of the loan was at the upper limits of the credit union's loaning policy.

The executive committee of defendant credit union conferred relative to the loan and concluded the prospect for payment, performance or realization of the collateral was significantly impaired and the Thunderbird should be repossessed. On the

night of December 9/10, 1979, repossession occurred peaceably, but without consent.

Although not necessary to the issue before us, the following events occurred subsequent to the December, 1979, repossession and should be stated in order to understand fully this lawsuit. Plaintiff contacted the credit union shortly after the repossession in order to secure return of the Thunderbird. The credit union rejected plaintiff's new husband, Victor F. Medling, as a co-signer, but accepted plaintiff's father, Floyd H. Bonham, as cosigner. The automobile was returned to plaintiff. Thereafter a long history of nonpayment and payment by insufficient fund checks unfolded. Ultimately, the credit union filed a replevin action and, upon securing a judgment therefor, the Thunderbird was turned over to defendant on February 23, 1981, and was subsequently sold.

Defendant credit union had the burden of proof under 16a-5-109(2) to establish the prospect of payment, performance, or realization of collateral was significantly impaired at the time of repossession. Plaintiff does not challenge the trial court's determination the credit union had the burden of proving "significant impairment" by the preponderance of the evidence. As stated in *McGraw v. Sanders Co. Plumbing & Heating, Inc.,* 233 Kan. 766, 667 P.2d 289 (1983):

"[T]he general rule [is] that the 'burden of proof on any point is upon the party asserting it . . . .' *In re Estate of Wright,* 170 Kan. 600, 604, 228 P.2d 911 (1951). Thus the defendant would have the burden to plead and prove his claims. Since the standard in all but a few specifically excepted civil cases is a preponderance of the evidence, the defendant would have the burden to prove his claims were more probably true than not." 233 Kan. at 773.

Plaintiff denies receiving the telephone calls from Mr. Erath on December 3, 4, 5 and 7, 1979, and relies heavily on this denial in contending the credit union failed to meet its burden of proof. In so doing, plaintiff improperly asks this court, on appellate review, to weigh the evidence. See *Bell v. Tilton,* 234 Kan. at 468.

It is undisputed that on November 27, 1979, plaintiff: (1) advised the credit union she was going to quit her job at Western Electric on January 4, 1980; (2) in fact, quit her job on November 27, 1979; and (3) was going to move to Michigan taking the automobile to an address which the credit union was unable to verify. Additionally, the trial court found that plaintiff was con-

tacted by the credit union on December 3, 4, 5 and 7, 1979, for the purpose of having her come to the credit union to explain the obvious inconsistencies between plaintiff's stated plans and her actual conduct. On each occasion plaintiff promised to come to the credit union shortly thereafter but did not appear. Plaintiff had been divorced from the cosigner of the loan subsequent to its execution. The cosigner was not an employee of Western Electric, and the cosigner was "apparently not very reliable."

We conclude the findings of the trial court relative to this issue are supported by substantial competent evidence including the trial court's conclusion the credit union was entitled to declare a default and repossess the automobile on the basis the prospect of payment, performance, or realization of the collateral was significantly impaired. K.S.A. 16a-5-109(2).

The second issue is whether the trial court erred in not holding the repossession was unlawful for failure to give prior notice of default pursuant to K.S.A. 16a-5-110.

K.S.A. 16a-5-110 provides:

"(UCCC) Notice of consumer's right to cure. (1) *After a consumer has been in default for ten (10) days for failure to make a required payment in a consumer credit transaction* payable in installments, a creditor may give the consumer the notice described in this section. A creditor gives notice to the consumer under this section when he delivers the notice to the consumer or delivers or mails the notice to the address of the consumer's residence (subsection (6) of section 16a-1-201).

"(2) The notice shall be in writing and shall conspicuously state: The name, address, and telephone number of the creditor to which payment is to be made, a brief description of the credit transaction, the consumer's right to cure the default, and the amount of payment and date by which payment must be made to cure the default. A notice in substantially the following form complies with this section:

---
(Name, address, and telephone number of creditor)
---
(Account number, if any)
---
(Brief description of credit transaction)

_____is the LAST DAY FOR PAYMENT
(Date)

_____is the AMOUNT NOW DUE
(Amount)

"You are late in making your payment(s). If you pay the AMOUNT NOW DUE (above) by the LAST DAY FOR PAYMENT (above), you may continue with the contract as though you were not late. If you do not pay by this date, we may exercise our rights under the law.

"If you are late again in making your payments, we may exercise our rights

without sending you another notice like this one. If you have questions, write or telephone the creditor promptly." (Emphasis supplied.)

The Kansas comment following 16a-5-110 states:

"This section, giving the consumer an opportunity to cure a default, is new to Kansas law. It works this way: If a consumer misses an installment payment due on April 10, the creditor must wait until April 20, at which point he may send to tne consumer a written notice indicating the default and the amount due. The 'last day for payment' would be shown as May 10, the end of the cure period as provided in 16a-5-111. A notice in substantially the same form as provided in this section will suffice. The philosophy of this section, and the next, is to give the consumer a fair opportunity to bring his payments current before 'acceleration, repossession, or suit. *This notice form applies only in the case of a missed installment; there is no such requirement when the default involves a 'substantial' impairment of the prospect for payment or realization .on the collateral.* [See 16a-5-109]. On the other hand, it should be obvious that the missing of an installment by itself is insufficient to constitute a 'significant impairment.' " (Emphasis supplied.)

The specific language of the statute and the Kansas Comment following the statute show there is no requirement of notice prior to repossession where the default is predicated upon substantial impairment of collateral pursuant to 16a-5-109(2) as opposed to failing to make an installment payment under 16a-5-109(1).

There are reasons why no notice is required in default for the prospect of substantial impairment situations. Where default occurs under .16a-5-109(2) the prospects of a continuing relationship between the creditor and the debtor is endangered, so such default is not subject to cure. Miller & Warren, *1974 Uniform Consumer Credit Code,* 23 Kan. L. Rev. 619, 646, n. 255 (1975). When default is not subject to cure there is no need to give notice. As one commentator has noted, it is important to observe from the statutory language of 16a-5-110, notice is only relevant when installment default is involved. Murray, *Summary Repossession, Replevin, and Foreclosure of Security Interests,* 46 J.K.B.A. 93, 95 (1977).

"Equally important is the fact that the type of default contemplated involves only the failure to pay a required installment. Thus, if the debtor is in default for having allowed the insurance coverage on his secured automobile to lapse (and assuming that such a default satisfies the creditor's burden under the UCCC of demonstrating that the prospect of payment, performance or realization upon its collateral is significantly impaired), *no notice of right to cure is required."* 46 J.K.B.A. at 95. (Emphasis supplied.)

The security agreement herein provided repossession could

be had without prior notice. As previously noted, 16a-5-110 does not require notice in this type of default and hence the agreement of the parties was not in violation of the UCCC. We conclude this issue is without merit.

For her third issue plaintiff contends the trial court erroneously considered her post-repossession nonpayment conduct in concluding the December, 1979, repossession was lawful. While the trial court discussed the post-repossession facts, it specifically stated that in determining the lawfulness of the repossession it did not "have to look at the post-repossession facts to arrive at that decision." We find no reversible error relative to this issue.

The first three issues heretofore decided all relate to the December, 1979, repossession of the automobile. The fourth issue relates to the sale of the automobile after it was delivered to the credit union in February, 1981, following a successful replevin action. The fourth issue may be stated as follows: Did the trial court err in finding the April, 1981, sale of the replevined automobile was commercially reasonable and, as a result thereof, err in entering a deficiency judgment against plaintiff?

K.S.A. 16a-5-103(1) provides:

"(1) This section applies to a deficiency on a consumer credit sale of goods or services and on a consumer loan in which the lender is subject to defenses arising from sales (section 16a-3-405); *a consumer is not liable for a deficiency unless the creditor has disposed of the goods in good faith and in a commercially reasonable manner.*" (Emphasis supplied.)

Creditor misbehavior in failing to sell the collateral in good faith and in a commercially reasonable manner is an absolute bar to a deficiency judgment under K.S.A. 16a-5-103(1) of the UCCC, but is not an absolute bar to a deficiency judgment under the Uniform Commercial Code (UCC), K.S.A. 84-1-101 *et seq.* The distinction was discussed in *Westgate State Bank v. Clark*, 231 Kan. 81, 642 P.2d 961 (1982), as follows:

"We have considered these two lines of cases and have concluded that the Kansas courts should distinguish between consumer transactions under the UCCC and nonconsumer transactions under the UCC. In consumer transactions, where there is creditor misbehavior such as failure to sell in a commercially reasonable manner, a claim for a deficiency judgment is absolutely barred. K.S.A. 16a-5-103 specifically so provides. When, however, the debtor is a *commercial* entity, the Kansas courts should use the rebuttable presumption approach. It cannot be denied that the more sophisticated debtor is in a better position to

grapple fairly with the creditor as to whether the sale was commercially reasonable or whether the unpaid balance of the debt exceeds the fair market value of the collateral. Furthermore, since the legislature did not see fit to include in the UCC, K.S.A. 84-1-101 *et seq.*, an express provision barring absolutely a deficiency judgment in cases of creditor misbehavior, the courts should hesitate to adopt such a rule. We further are impressed by the philosophy of the UCC which emphasizes good faith and reasonableness on the part of the parties with a view of avoiding penalty damages.

"To summarize, we hold as follows: Where a secured creditor sells the collateral in other than a commercially reasonable manner, the secured party is not absolutely barred from recovering a deficiency judgment from the debtor as a matter of law. In an action brought by a secured creditor for a deficiency judgment after a sale of the collateral in other than a commercially reasonable manner, there is a rebuttable presumption that the value of the collateral was equal to the unpaid balance of the debt and the burden of showing otherwise is on the secured creditor. The debtor is entitled to have the trier of fact calculate the damages which he suffered as a result of the unreasonable conduct and to have that amount set off against the amount the creditor would otherwise be entitled to recover." 231 Kan. at 90.

What is a commercially reasonable sale under the Uniform Consumer Credit Code? While the concept of commercially reasonable disposition of repossessed collateral under the Uniform Commercial Code has been widely considered, *e.g., Westgate State Bank v. Clark,* 231 Kan. 81; *Hall v. Owen Co. State Bank et al.,* 175 Ind. App. 150, 370 N.E.2d 918 (1977), 7 A.L.R. 4th 285; Clark, The Law of Secured Transactions Under the Uniform Commercial Code ¶ 4.8 (1980); White & Summers, Uniform Commercial Code § 26-11 (2d ed. 1980); Comment, *Uniform Commercial Code: Deficiency Judgments in a Commercially Unreasonable Setting,* 22 Washburn L. J. 160 (1982); Note, *Uniform Commercial Code: Aspects of a Commercially Reasonable Sale of Repossessed Property,* 19 Washburn L. J. 123 (1979); Comment, *Commercial Reasonableness Under the Uniform Commercial Code,* 33 Tenn. L. Rev. 211 (1966); and Annot., What is "Commercially Reasonable" Disposition of Collateral Required by UCC § 9-504(3), 7 A.L.R. 4th 308, there is a dearth of information specifically relating to commercially reasonable disposition under the Uniform Consumer Credit Code.

Kansas Comment 1 of 16a-5-103 states:

"Where there has been a default with respect to a secured consumer credit transaction, the rights of the creditor and debtor are controlled by part 5 (Default) of UCC article 9 (K.S.A. 84-9-501, et seq.), except to the extent that such rights are changed by this act (see K.S.A. 84-9-203)."

As the Kansas Comment reveals, in consumer credit transactions involving default, the Kansas Uniform Consumer Credit Code governs. However, when the UCCC is silent on consumer default, then the UCC provisions on default (K.S.A. 84-9-501 *et seq.*) are to be applied. Consequently, as the UCCC does not define what is a commercially reasonable disposition of repossessed collateral in a consumer credit transaction, courts may refer to UCC decisions in determining what is a commercially reasonable disposition of collateral.

In *Westgate State Bank v. Clark,* 231 Kan. 81, this court considered commercially reasonable disposition under the UCC. In *Westgate* we held:

"Where a secured creditor brings an action for a deficiency judgment after sale of the collateral, the burden of proof as to the commercial reasonableness of the sale is on the plaintiff creditor."

"Whether or not a sale of collateral by a secured creditor was conducted in a commercially reasonable manner is a question of fact to be determined by the trier of fact from a consideration of all relevant factors in the particular case." Syl. ¶¶ 4 and 5.

In *Westgate* a number of factors which might be relevant were discussed. Following the list of factors we stated:

"The above list of suggested factors is not intended to be exclusive and should not prevent a court from considering other relevant factors in a particular case.

"As noted heretofore, it is the philosophy of the UCC that the debtor and the secured creditor, in their dealings, should act toward each other in good faith and in a *reasonable* manner. In every case, that should be the ultimate test to be applied by a trial court in determining the issue of commercial reasonableness. Since the issue of commercial reasonableness is usually one of fact, the decision of the trial court will be sustained on appeal when there is substantial, competent evidence to support its findings." 231 Kan. at 95.

We see no legitimate reason why the *Westgate* rationale should not be applied to determining whether or not a sale of collateral was commercially reasonable under the UCCC.

The activities of defendant credit union relative to the sale of the Thunderbird may be summarized as follows. Defendant regained possession of the automobile in late February, 1981. An official of the credit union testified the automobile was dirty when received and he, personally, cleaned the vehicle, but was unable to remove a grease spot on the front seat. It would have cost $35.00 to $40.00 to have the automobile professionally

cleaned. There was no evidence that professional cleaning would have significantly increased the value of the vehicle.

Before offering the automobile for sale the credit union committee consulted the National Auto Research publication "Black Book" for April-May, 1981. The relative values for financing, wholesale and retail were established at $3,965.00, $4,375.00 and $5,075.00. The credit union considered the possibility of consigning the car to a dealer for sale but rejected consignment because it would cost approximately $400.00. The consignment cost, if the credit union had opted for this sale method, would have been taxed to plaintiff. The credit union also considered the possibility of public advertising but eventually decided to sell the 1979 Thunderbird through bid solicitations from Western Electric employees and family members. One of the factors in this determination was Western Electric policy precluded commercial selling to the public on company property.

The car was offered for sale to approximately five hundred Western Electric employees and their families by posting on bulletin boards at the Western Electric plant notice of sale and request for bids on the car. The bid notices were posted for two weeks, during which time the motor vehicle was available for inspection in the Western Electric parking lot. Copies of the notice of sale were sent to all parties on the financing note. Approximately six bids were received. The highest bid was $3,800.00. The credit union considered all bids too low and rejected them.

After the aborted attempt to sell the motor vehicle by a request for bids from Western Electric employees and family members, Mr. Schweiger, an official of the credit union, contacted two local Ford dealerships to solicit bids from them. Both dealerships, Schlozman Ford and Shawnee Mission Ford, indicated the market for 1979 Thunderbirds was sluggish. The softness in the market for Thunderbirds was apparently due to their perception by the public as "gas-guzzlers," and the public was then interested in fuel-efficient automobiles.

Schlozman Ford declined to submit a bid on the Thunderbird. At the time Schlozman Ford had two Thunderbirds on its lot and had been having difficulty selling them. Schlozman Ford was not interested in acquiring a third Thunderbird. After considerable coaxing by the credit union, Shawnee Mission Ford submitted a

bid of $4,200.00. On March 24, 1981, the credit union advised plaintiff it had rejected all bids as too low.

The credit union decided to make one last attempt at requesting bids from Western Electric employees and family members and repeated its prior procedure of posting notices on Western Electric bulletin boards requesting bids. Unlike the earlier occasion, however, the credit union set a minimum bid of $4,200.00—the bid which had been submitted by Shawnee Mission Ford.

The second request for bids proved more successful. A bid of $4,606.00 was received—four hundred dollars higher than Shawnee Mission Ford was willing to pay. The $4,606.00 bid was accepted. The proceeds of the sale were applied to plaintiff's debt, which then totaled $10,683.59. After deducting costs of the sale, a deficiency balance of $6,978.60, plus interest from April 10, 1981, was established. The credit union advised plaintiff of the sale, the resulting deficiency, and of her redemption rights.

Plaintiff contends the credit union should have advertised the Thunderbird to the general public. Plaintiff produced a car dealer, Mr. Hoffman, a sales manager for Olathe Ford, who testified the suggested retail price of the vehicle was $6,000.00 to $6,250.00 during the applicable time period.

In holding the sale was in good faith and commercially reasonable, the trial court stated:

"The Court feels that the sale of the vehicle although it could have been done possibly better with more in the way of advertising marginally is a commercially reasonable sale. The Court is not an expert in the values of vehicles, however, the Court did have testimony for it that a dealer would try to pay slightly less than the amount of money that the Credit Union got for the vehicle. The Credit Union also by summing it in this way did not have to pay additional charges for its sale which is something that a car dealer writes into the price that he sells the vehicle. This is a credit union who is repossessing it. Mrs. Medling [plaintiff] had been a longtime member of the Credit Union. She has I think at least constructive notice as to how things work at the Credit Union and it's up to the Credit Union to do the best they can in selling these vehicles but they don't have to do everything that a car dealer should do as long as the price that they get is reasonable. Now, there is a dispute as to what is the exact reasonable cost and the price of the car and the Court wasn't helped a whole lot by the welter of the different figures by black, red and whatever other color books are used by the various dealers. We do know that at the time of the eventual sale of this vehicle two dealerships were contacted. One of them considered the Thunderbird not an attractive item at all and refused even to put in a low bid of $3,800 or whatever on the vehicle, just wasn't interested at all, and the other dealership after some prodding and in an effort by the Credit Union to put in a bid of $4,200 which would have been

substantially lower than Mr. Hoffman said he would have been willing to pay but, of course, at that time I don't know if he had a dealership then but he didn't see the vehicle and he did not place any bid at that time. So, we are rather looking retrospectively back on this and I think all things considered the sale was commercially reasonable. The price was given on the car was on the low side but not so low as to raise suspicion that it was sold at a loss or sold for any reasons—reason other than to obtain as much money as possible to decrease the amount that was still owed."

We conclude the findings of the trial court that the sale of the automobile was made in good faith and was commercially reasonable are supported by substantial competent evidence and, accordingly, they will not be disturbed upon appeal. Based thereon, we further conclude the trial court did not err in entering a deficiency judgment against plaintiff on the counterclaim of defendant credit union.

The judgment is affirmed.