No. 62,502

PRAIRIE STATE BANK, *Appellee,* v. JOHN HOEFGEN and DONNA HOEFGEN, *Appellants.*

(777 P.2d 811)

Opinion filed July 14, 1989.

*Craig T. Limbocker*, of Morrison, Hecker, Curtis, Kuder & Parrish, of Wichita, argued the cause and was on the brief for appellants.

*Michael G. Coash*, of Bond, Bond & Coash, of El Dorado, argued the cause and was on the brief for appellee.

The opinion of the court was delivered by

Six, J.: In this action by a bank to foreclose two real estate mortgages and a security interest in personal property, the questions on appeal relate to: (1) the admissibility of certain evidence challenged as being hearsay; (2) a determination of significant impairment under K.S.A. 16a-5-109(2) of the Uniform Consumer Credit Code (UCCC); and (3) the bank's entitlement to a deficiency judgment.

Trial was to the court. We find no error and affirm.

## Facts

John and Donna Hoefgen, defendants, purchased Shafer's Floral and Greenhouse, an established business in Augusta, Kansas. John Hoefgen had been a longtime customer of plaintiff, Prairie State Bank.

The current litigation arises from promissory notes, in the amounts of $2,003, $12,590.02, and $110,615, taken out by the Hoefgens with Prairie State for the operation of the floral business. The two larger notes were renewals of previous business loans to the Hoefgens. The notes were secured by paint-stripping equipment, the inventory and equipment of Shafer's Floral, a Chevy van, and the assignment of five different insurance policies. In addition, the Hoefgens mortgaged Shafer's Floral to Prairie State and gave the bank a second mortgage on their family home.

In March 1985, the Hoefgens approached Prairie State about the possibility of financing the sale of the floral business to the Earl Wards and the Richard Schneiders (hereafter Ward and Schneider). The bank turned down the loan because Ward and Schneider did not have sufficient capital. John Hoefgen was apparently anxious to sell the business because Donna Hoefgen, his wife, was in poor health. The Hoefgens decided to lease the business for a year to Ward and Schneider with an option to purchase. The bank gave Ward and Schneider a line of credit for operating expenses. Dennis Bush, senior vice president of the

Bank, testified that, at the time the lease was negotiated, Hoefgen threatened to turn the keys to the business over to the bank if something was not worked out with Ward and Schneider.

According to Bush, the payments on the Hoefgens' largest loan with Prairie State were dependent on the lease payments. Ward and Schneider made the payments directly to the bank, not through the Hoefgens. Bush testified that, toward the end of 1985, Ward and Schneider became further behind on their monthly lease payments. Bush said that the inventory in the business was declining and that Ward and Schneider did not have enough capital to keep the business running profitably.

Russ Harder, assistant vice president of the bank, was the officer handling the Hoefgen accounts. Harder testified that troubles with the Hoefgen loans began in November or December of 1985, when the Hoefgens hired Chuck Henry as a business consultant. The Hoefgens were having trouble making the payments on the two smaller notes. Harder testified in detail as to the conversations and correspondence he had with Chuck Henry regarding Shafer's Floral. Defense counsel repeatedly objected to this testimony as hearsay. The court admitted the testimony because Henry was under subpoena and it was presumed that Henry would be testifying. Two letters written by Henry to officers of the bank were admitted in evidence. Defense counsel did not object to the first letter. The second letter was objected to on grounds of hearsay and lack of foundation.

Although Henry was under subpoena, he did not appear at trial. He was not called to the witness stand. Defense counsel moved to strike all of the out-of-court statements made by Henry. The court offered to issue an order to compel attendance so that the defendants could cross-examine Henry concerning his statements, but defense counsel declined. The court also later ruled that some of Henry's statements were admissible as declarations against interest pursuant to K.S.A. 1988 Supp. 60-460(j). The court held that the letter objected to by defense counsel was a business record kept in the regular course of business. John Hoefgen testified that he hired Henry as a business consultant, but he did not authorize him to deal with the bank in regard to the loans and he did not tell him to make any representations to the bank officers. Hoefgen also testified that he knew that Henry was meeting with bank officials concerning Shafer's Floral and

that he never informed the bank that Henry was not acting on his behalf.

According to Harder, Henry came in to meet with him concerning the floral business in December of 1985. Henry told Harder that the business was losing money and that the bank should hire Henry to manage the business and keep it solvent. Henry said that he expected the bank to pay his fee, because the Hoefgens didn't have the money. After the meeting, Henry sent Harder a follow-up letter. Henry estimated that the bank stood to lose between $75,000 and $90,000 on Shafer's Floral if it did not forgive a portion of the debt and hire Henry to supervise the recovery of the business. Henry also stated that if the bank did not forgive a portion of the debt, the Hoefgens would take bankruptcy.

The Hoefgens did not pay the January 1986 payment on the $2,003 note. The bank sent the Hoefgens a UCCC notice of default and right to cure which stated that the Hoefgens had until February 7 to make the payment without being at risk of acceleration, repossession, or suit. The Hoefgens also did not pay the January 1986 payment on the $12,000 note. Harder called John Hoefgen to set up a meeting with him in early January. Harder testified that, after the Hoefgen call, Henry was upset and told Harder that there would be no meeting with the Hoefgens. On January 13, Henry sent another letter to the bank. This letter was addressed to Newton Male, Chairman of the Prairie State Bank Board. The second letter was highly critical of Russ Harder. The letter stated that Henry had advised the Hoefgens not to take any action. Henry also reiterated the threats of bankruptcy.

Harder continued to try to contact John Hoefgen, finally reaching him on January 22, 1986. According to Harder, Hoefgen refused to meet with him and told him that Chuck Henry would be in touch with him. According to Hoefgen, he told Harder that he (Hoefgen) would prefer to meet with Newton Male. Hoefgen denied that he told Harder that Harder would be hearing from Henry.

On January 24, counsel for the bank sent a letter to the Hoefgens. The letter cited the Hoefgens' failure to communicate with the bank and stated that the bank was accelerating both the $12,000 and the $110,000 notes to be immediately due and payable. The letter stated that the bank would file foreclosure

suits on January 29 unless the balances on the notes were paid in full. Hoefgen said he did not attempt to contact either Harder or Male after receipt of this letter.

On January 29, Richard Schneider, one of the lessees of the floral shop, called Bush to discuss some financial matters with him and told Bush that John Hoefgen had removed some equipment from the business premises. Schneider told Bush about some conversations with Chuck Henry in which Henry suggested that Ward and Schneider also file for bankruptcy so that they could "get" the bank. Schneider testified that on December 22, 1985, he had discussed the floral business with Henry on the telephone and that Henry had said that, pursuant to Henry's advice, the Hoefgens were no longer going to make their bank payments. Schneider said that Henry told them that if Ward and Schneider did not make their lease payments it would help Henry and the Hoefgens "bring the bank to their knees."

Schneider further testified that on January 23, 1986, Henry and the Hoefgens came to the floral shop and told Schneider that the Hoefgens were filing for bankruptcy. Henry suggested that the Schneiders turn over the keys to the business to him and that they also file for bankruptcy. Henry instructed Schneider that any business dealings in the future were to be conducted through him, not the Hoefgens, and that the lease payments were to be made to the Hoefgens instead of directly to the bank. Schneider testified that he had told Bush about the meeting with Henry and that he knew what Henry's intentions were, but he did not remember if he told Bush the exact details of his conversations with Henry and the Hoefgens. In her testimony, Donna Hoefgen verified that the meeting with the Hoefgens, Henry, and Schneider had occurred.

On January 29, after receiving the above-mentioned information from Schneider and upon advice of counsel, the bank decided to close Shafer's Floral. Harder and Bush went to the business and told Mrs. Schneider and Mrs. Ward that the business was to be closed down. The building was padlocked. Neither the Hoefgens nor Chuck Henry attempted to contact the bank after the business was closed.

John Hoefgen testified that the only equipment removed from Shafer's Floral was not business equipment, but were items that the Hoefgens had borrowed from family members and were

returning. Harder testified that, at the time the bank closed the business, the paint-stripping equipment which secured the $2,000 note was not there and that it had not been located. The bank offset $62.43 from Shafer's Floral's checking account. The promissory notes gave the bank a security interest in the Hoefgens' deposit accounts with the bank. Setoff was authorized under the terms of the notes in the event of default, as was acceleration and repossession of collateral. The bank sold off the perishable plants and flowers and the Valentine's Day merchandise by taking bids from the two other floral shops in Augusta. The $245.50 which was received was applied against one of the loans. The bank cashed in the life insurance policies which had been assigned as collateral.

When the Hoefgens and their attorney finally met with bank officials, John Hoefgen told the bank that he did not want the business back and that he did not intend to make any more payments. The bank made several attempts to sell the business property, but the Hoefgens rejected the one offer received for the business. The bank filed this action requesting a judgment against the Hoefgens in the amount of $123,288.05 plus interest and costs and foreclosure of the mortgages on the business property, the Hoefgen residence, and the security interest in remaining personal property. The Hoefgens filed a counterclaim. They alleged that the bank had (1) wrongfully seized the business property; (2) violated the statutory notice provisions of the UCCC; (3) caused Donna Hoefgen severe mental distress; and (4) not disposed of the collateral in a commercially reasonable manner. The Hoefgens demanded compensatory damages and $1 million in punitive damages.

The trial court denied the Hoefgens' request for a jury trial. Although the notes in question were associated with business loans, the parties stipulated that the notes were subject to and covered by the UCCC.

The trial court found that the bank had sustained its burden of proof. The court reasoned that default was properly declared because the prospect of payment, performance, and realization of collateral was significantly impaired pursuant to K.S.A. 16a-5-109(2) and the terms of the notes. The trial court further held that the bank was authorized to take possession of the property and that the subsequent sale of collateral was done in good faith and

in a commercially reasonable manner. A personal judgment was entered against the Hoefgens. The mortgages and security agreements were foreclosed. The counterclaims were denied.

The Hoefgens' motion to alter or amend judgment was denied. The real estate was sold at a sheriff's sale and the sale was confirmed. The trial court stayed execution on the bank's deficiency judgment against the Hoefgens pending this appeal.

## The Hearsay Issue

In his memorandum opinion, the trial judge set out the following conclusions of law:

"D. The Hoefgens employed Chuck Henry as their agent and representative in their negotiations with the Bank. It was not necessary that he furnish the Bank with a signed Power of Attorney before the bank was justified in believing that he acted and spoke for the Hoefgens. He told this repeatedly to the Bank and Mr. Hoefgen confirmed it in the telephone conversation of January 22, 1986, with Russ Harder. The Hoefgens cannot now say that his actions were not their actions.

"E. In passing, the Court can hardly avoid mentioning the impact of Chuck Henry and his actions and letters upon the Bank, and upon this Court. The Court notes that Mr. Henry arrogantly ignored this Court's subpoena to appear at trial. The Court finds the letters he sent to the Bank and his advice to Mr. Schneider and the Hoefgens to avoid payment in order to bring the Bank to its knees to be absolutely reprehensible. The Court can hardly imagine a circumstance which could have more quickly undermined and destroyed whatever relationship might have remained between the Hoefgens and the Bank prior to his appearance upon the scene."

The trial court initially allowed the prior statements of Henry into evidence under K.S.A. 1988 Supp. 60-460(a) (previous statements of persons present) because Henry was under subpoena and was expected to testify. Henry, however, never appeared, nor did the bank or the Hoefgens call him as a witness. The Hoefgens argue that, because Henry was not compelled to testify and they did not get an opportunity to cross-examine him, all evidence of his out-of-court statements should be stricken from the record.

The Hoefgens did not object to the admission of the first letter into evidence.

The letters could not be admitted as business records pursuant to K.S.A. 1988 Supp. 60-460(m). *State v. Guhl*, 3 Kan. App. 2d 59, 61, 588 P.2d 957 (1979).

The bank argues that Henry's statements and letters were not hearsay because they were not presented to "prove the truth of

the matter asserted," but to show why the bank took the actions that it took. "We have consistently held that extrajudicial statements, offered not to prove the truth of the statement but merely to prove that the statement was made, are not inadmissible as hearsay." *State v. White & Stewart*, 225 Kan. 87, 95, 587 P.2d 1259 (1978). An example of a nonhearsay declaration is one offered to show the reaction of one to whom the statement is made. 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-460 Comments, p. 226 (1979). The bank contends that whether the statements made in the letters were true was not significant to the issue of whether the bank reasonably believed that the prospect of payment, performance, or realization of collateral was significantly impaired pursuant to K.S.A. 16a-5-109(2).

The Kansas comment to K.S.A. 16a-5-109 states:

"Under prior Kansas law (UCC 84-1-208 and 84-9-501), the creditor had unilateral power to define 'default' as broadly as he desired in the security agreement. For example, the UCC authorizes 'insecurity clauses' under which default and acceleration can be called whenever the creditor in good faith deems himself 'insecure.' This section precludes such a one-sided definition of default by setting forth an objective standard requiring either a missed installment or a significant impairment in the prospect for payment, performance, or realization of collateral. Unlike UCC 84-1-208, the burden is on the creditor to prove that a default occurred if there has been no missed installment."

The Hoefgens argue that, given the objective standard they claim is required under the statute, what the bank reasonably believed was irrelevant. They argue that the letters were offered to prove the truth of the matter asserted: that the loans were significantly impaired.

Along with other relevant evidence, a trial court, as it seeks to determine "significant impairment" under K.S.A. 16a-5-109(2), may consider the reasonable beliefs of the lender. In the case at bar, the bank contends the letters and statements of Henry were offered not as proof that the statements were actually true, but as proof that the bank reasonably believed that there was significant impairment. They were also offered to explain the actions of the bank.

In *Mills v. Riggle*, 83 Kan. 703, 708, 112 Pac. 617 (1911), this court stated:

"It is claimed that the court erred in permitting the plaintiff to testify that at the time he made the loan he had heard that Riggle was financially responsible. It is insisted that this was hearsay. If the question had been asked in proof of the

fact that Riggle was financially responsible the evidence would have been hearsay; but such was not the purpose of the question, which was to establish the fact that the plaintiff relied upon what he had heard as to the financial responsibility of Riggle."

K.S.A. 1988 Supp. 60-460(h) and (i), in pertinent part, state:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

. . . .

"(h) *Authorized and adoptive admissions.* As against a party, a statement (1) by a person authorized by the party to make a statement or statements for the party concerning the subject of the statement or (2) of which the party with knowledge of the content thereof has, by words or other conduct, manifested the party's adoption or belief in its truth.

"(i) *Vicarious admissions.* As against a party, a statement which would be admissible if made by the declarant at the hearing if (1) the statement concerned a matter within the scope of an agency or employment of the declarant for the party and was made before the termination of such relationship . . . ."

The trial court made a specific finding that Henry was the agent of the Hoefgens. John Hoefgen admitted that he had hired Henry and that he knew Henry was meeting with bank officials concerning Shafer's Floral. In addition, Schneider testified that the Hoefgens accompanied Henry to the January meeting at the floral shop. He also testified that Donna Hoefgen indicated that she was going to follow Henry's advice and not pay the bank. Mrs. Hoefgen admitted that the meeting had taken place although she did not testify as to what occurred at the meeting.

"The question here is not the issue of agency but that of to what extent the principal is bound by the statements of his agent. The Kansas cases have announced the rule in terms of the principal being bound by the statements of his agent if they were made in the scope of the business or matters the agent was charged with. . . . [I]t is predicated upon a showing that the agent was authorized, expressly or impliedly, to make *a statement or statements* concerning the subject matter to which the statement pertains." 1 Gard's Kansas C. Civ. Proc. 2d Annot. § 60-460(h) p. 252 (1979).

By linking the court's ruling that Henry was the Hoefgens' agent with the evidence supporting that ruling, Henry's statements could have been admitted pursuant to either K.S.A. 1988 Supp. 60-460(h)(1) or (i)(1).

According to *Schlatter v. Ibarra,* 218 Kan. 67, 72, 542 P.2d 710 (1975), there must be some evidence extrinsic to the actual hearsay evidence to establish a substantial basis that an agency existed before hearsay may be admitted. There was substantial

evidence that an agency relationship existed between Henry and the Hoefgens. The bank has never asserted, nor did the trial court rule, that Henry's statements could be admitted under the agency exception. The reasons given by the district court for its decision are immaterial so long as its ruling was correct for any reason. *Arensman v. Kitch,* 160 Kan. 783, 792, 165 P.2d 441 (1946).

The first letter from Henry to the bank may be admitted because no contemporaneous objection was made against its admission at trial. The second letter (as well as the first) and the statements to Harder may be admitted for either the reason that they were not offered for the truth of the matter asserted (not hearsay) or as adoptive or vicarious admissions (hearsay exceptions).

## Significant Impairment

K.S.A. 16a-5-109 states:

"An agreement of the parties to a consumer credit transaction with respect to default on the part of the consumer is enforceable only to the extent that

"(1) the consumer fails to make a payment as required by agreement; or

"(2) the prospect of payment, performance, or realization of collateral is significantly impaired; the burden of establishing the prospect of significant impairment is on the creditor."

The Hoefgen notes contained an identical impairment provision.

The Hoefgens maintain that the bank did not notify them of their right to cure; as required by K.S.A. 16a-5-111 when default is based solely on failure to make a required payment. The record indicates that the UCCC right to cure notice was sent regarding the $2,003 note, but we find no evidence of other notice. When default is based on impairment of collateral, however, the consumer has no right to cure under the UCCC and hence no notice is required. The trial court found that the bank had sustained its burden of proof on the issue of significant impairment. The court listed thirteen factors in reaching its decision:

"1. John Hoefgen's early problems with insufficient funds checks;

"2. The total inventory in the flower shop gradually declined during 1985;

"3. The Wards and Schneiders were attempting to get out of their lease arrangement early;

"4. The performance of Ward/Schneider was literally the performance of the Hoefgens;

"5. A perishable inventory;

"6. Declining sales;

"7. Refusal of the Hoefgens to communicate with the Bank;

"8. The prospects of future payment appeared nil;

"9. The threats and letters from Chuck Henry;

"10. The spectre of bankruptcy and the fear that the Bank would sustain a significant loss due to the apparent present value of the flower shop;

"11. Creditors and wholesalers cancelling the lessees' credit;

"12. The threats and comments made to Richard Schneider by Chuck Henry about the Bank and the intention of the Hoefgens not to make any further payment;

"13. Mrs. Hoefgen's poor health and their unwillingness to operate the flower shop themselves."

The only Kansas case interpreting K.S.A. 16a-5-109(2) is *Medling v. Wecoe Credit Union*, 234 Kan. 852, 678 P.2d 1115 (1984). In *Medling*, the credit union had repossessed Medling's car because of significant impairment. Medling sued under the UCCC for unlawful repossession. The credit union countersued for a deficiency judgment. Medling appealed the trial court's ruling in favor of the credit union. Medling contended there was insufficient evidence to support the trial court's finding that the credit union had properly declared default because the prospect of payment, performance, or realization of collateral was significantly impaired. No payments had been missed.

We said that the credit union had the burden of proving significant impairment by a preponderance of the evidence. In affirming the trial court, we followed the well-established rules of appellate review where sufficiency of the evidence is challenged:

"The appellate court will not weigh the evidence or pass upon the credibility of the witnesses. Under these circumstances, the reviewing court must review the evidence in the light most favorable to the party prevailing below." *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, Syl. ¶ 1, 681 P.2d 1038, *cert. denied* 469 U.S. 965 (1984).

The Hoefgens cite *McKay v. Farmers & Stockmens Bank of Clayton*, 92 N.M. 181, 585 P.2d 325 (1978), to support their argument that the threat of bankruptcy should not supply a basis for significant impairment. The *McKay* case involved the alleged insecurity of a bank under the UCC. The trial court had entered summary judgment in favor of the lender. In the case at bar, there was a full trial on the merits. In *McKay*, the court specifically

found that the value of the lender's security was greater than the indebtedness. 92 N.M. at 183.

Harder and Bush, officers of Prairie State, testified as to past problems with diminishment of collateral where the borrower had taken bankruptcy. Bush testified that the notes were under-collateralized to the extent of $60,000.

The Hoefgens emphasize the fact that the bank was mistaken in its assumption that they were removing collateral from the business premises. The trial court, however, did not list the removal of the collateral as a factor in its decision. There was testimony that one item of collateral had been removed to John Hoefgen's father's house.

A major factor in the finding of significant impairment is the Hoefgens' refusal to communicate with the bank. In its memorandum opinion, the district court specifically found that the testimony of the Hoefgens as to their attempts to contact the bank was not credible. The Hoefgens did not respond, even after the bank sent out the January demand letter. Harder had repeatedly attempted to have John Hoefgen meet with him.

The failure to communicate with Prairie State was coupled with the fact that the Hoefgens had failed to make their January payments on two of the notes. The Hoefgens, through their agent, had threatened bankruptcy. The notes were substantially undercapitalized, and the lessees, upon whom the Hoefgens were dependent for payments on the largest note, were also encountering serious financial difficulties. Schneider testified that Donna Hoefgen indicated that she was not going to make any more payments to the bank. The trial court made a specific finding in its memorandum opinion that Schneider had told Bush of the Hoefgens' intentions.

The Hoefgens cite *Van Bibber v. Norris,* 404 N.E.2d 1365 (Ind. App. 1980), to advance their argument that the bank declared default and then tried to justify its actions after the fact. *Van Bibber* concerned the wrongful repossession of a mobile home. The trial court had ruled in favor of the borrower. The Indiana Court of Appeals found that many of the factors asserted by the lender in support of its position that it was insecure were events that occurred *after* the lender had made its decision to repossess. That is not the Hoefgens' situation. The borrower in *Van Bibber* had also paid approximately 70 percent of the pur-

chase price of the mobile home. The value of the mobile home exceeded the amount due on the note. Prairie State's January letter indicates that the bank *was* concerned prior to closing the business down. The letter specifically mentions the Hoefgens' failure to communicate with the bank, in addition to the missed payments.

The findings of the trial court on the issue of significant impairment are supported by substantial competent evidence. We affirm the trial court's conclusion that Prairie State was entitled to declare a default pursuant to K.S.A. 16a-5-109(2).

The Deficiency Judgment

In *Westgate State Bank v. Clark*, 231 Kan. 81, 85, 642 P.2d 961 (1982), we stated:

"It is important to note that under K.S.A. 16a-5-103 a consumer is not liable for a deficiency judgment as a matter of law unless the repossessed creditor had disposed of the goods in good faith and in a commercially reasonable manner."

In *Medling*, we said that since the UCCC does not define what is a commercially reasonable disposal of collateral, courts may refer to UCC decisions on this issue. 234 Kan. at 863.

The trial court held that the sale of collateral by Prairie State was done in a commercially reasonable manner. The real estate and other inventory were not disposed of until after trial. The Hoefgens are vague as to which collateral they are referring to. They refer to personal property collateral and business inventory. They also mention the deterioration of the floral shop and greenhouse.

Harder testified that the bank did not want the floral shop building, but wanted to prevent inventory from being removed. Several weeks after the bank had taken possession, Harder met with the Hoefgens and their attorney and offered to let them take the building back. Hoefgen testified that he was not interested in reopening the shop. The bank also secured a buyer for the business for $42,000, but the Hoefgens would not sign the contract. In his first letter to the bank, Henry asserted that the business would not bring more than $25,000 to $30,000 in liquidation. The business real estate was ultimately sold at a sheriff's sale for $30,000.

The commercial reasonableness of a sale of collateral by a secured creditor is a question of fact to be determined by the trier of fact. The creditor has the burden of proving commercial

reasonableness. *Garden Nat'l Bank v. Cada*, 241 Kan. 494, 495, 738 P.2d 429 (1987); *Kelley v. Commercial National Bank*, 235 Kan. 45, 51, 678 P.2d 620 (1984).

The Hoefgens' arguments center on the assertion that the bank held the collateral too long and did not sell it during the pendency of the litigation. The Hoefgens ignore the fact that the bank secured a buyer for the floral shop and greenhouse but the Hoefgens refused to cooperate in the sale. The buyer was offering $12,000 more than was ultimately bid at the sheriff's sale.

The Hoefgens also fail to mention the fact that they denied the bank's right to possession of the collateral and filed a counterclaim in excess of $1 million. The Hoefgens have cited several cases from other jurisdictions in which the court held that retention of collateral by the secured creditor for a long period of time precluded a deficiency judgment. In none of those cases, however, had the debtor challenged the creditor's right to repossess the collateral. The passage of time is but one factor to consider in the determination of whether a sale is commercially reasonable.

Affirmed.