No. 74,725

STATE OF KANSAS, *Appellee*, v. MICHAEL D. NINCI, *Appellant*.

(936 P.2d 1364)

22

Opinion filed April 18, 1997.

*Elizabeth Seale Cateforis*, assistant appellate defender, argued the cause, and *Jessica R. Kunen*, chief appellate defender, and *Michael D. Ninci*, pro se, were with her on the briefs for appellant.

*Steven J. Obermeier*, assistant district attorney, argued the cause, and *Paul J. Morrison*, district attorney, and *Carla J. Stovall*, attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

ABBOTT, J.: This is a direct appeal by the defendant, Michael D. Ninci, from his convictions of felony murder (K.S.A. 1992 Supp. 21-3401), robbery (K.S.A. 21-3426 [Ensley 1988]), and aggravated

burglary (K.S.A. 1992 Supp. 21-3716). Ninci appeals, raising some 13 issues.

Michael Owen was killed at his home in Leawood, Kansas, in the late evening or early morning of September 10 or 11, 1992. Owen's neighbors discovered his body outside his townhouse the morning of September 11, 1992.

A neighbor of Owen's, Lauren Auch, was out walking her dog on September 10, 1992, at approximately 10:30 p.m., and she noticed an unfamiliar car parked in Owen's driveway. Auch testified at trial that photos of Ninci's Saab looked very similar to the car she had seen in the driveway on the night of the murder, but she could not say for certain that it was the same car.

A pathologist discovered two wounds to Owen's head, indicating that he had been hit in the head with a heavy object. She also observed a deep cutting wound across Owen's neck which sliced his jugular vein. The pathologist concluded that Owen had bled to death after his throat was cut.

A week into the investigation, Harold Glen Ford had become the prime suspect in the case. Elizabeth Berkley was identified as Ford's girlfriend and was interviewed several times. During the third interview, Berkley gave the police Ninci's name. Berkley told the police that on September 10, 1992, Ninci and Ford had gone to a house in Leawood to visit with someone.

During a 3-hour videotaped interview at the Leawood police station, Ninci admitted that he was present at Owen's home the night of the murder and was with Ford. Ninci indicated that he had only known Ford for a few months and did not know him well. Ninci knew that Ford sold and used cocaine. During their acquaintance, Ford had told Ninci that he knew a rich guy named Mike and that Ford wanted to kill him, but Ninci "blew off" this talk. On the afternoon of September 10, 1992, Ford and Ninci visited Owen in his Leawood home. Ninci then realized that Owen was "Mike," the person Ford wanted to kill. The two men stayed at Owen's residence for approximately 40 to 45 minutes, during which time Owen showed them around his home. Owen was a collector and had collections of art, wine, glasses, baseballs, and jewelry.

Ninci told the police that Owen invited them to come back later that evening after Owen returned from working out.

Ford and Ninci returned to Owen's home later that evening. Ninci parked his Saab in Owen's driveway. According to Ninci, the three just socialized for awhile. Ninci stated that he used the bathroom and that after he returned from the bathroom, he looked around and saw Owen "laid out." Ninci stated that he saw Ford cut Owen's throat. Ninci stated that Ford was telling him what to do and was moving around the house taking things. Ninci admitted that he also took some items from Owen's home. According to Ninci, Ford directed Ninci to drive him to the airport. Ninci did so, and Ford flew to Las Vegas.

The police recovered some of Owen's property in Ninci's home, in Ninci's parents' home, and from Timothy Haas. At trial, Haas explained how he came to be in possession of Owen's property. Haas testified that at 4 a.m., on September 11, 1992, he was awakened by insistent, loud knocking at his door. The knocking lasted 10 to 15 seconds. Later, the phone rang. Haas let his answering machine pick up, but when he heard Ninci's voice, Haas answered. Ninci told Haas he had something real important to come over and talk about. After a few minutes, Ford and Ninci arrived at Haas' apartment. When the two arrived, their clothing was not torn or bloody. Ford told Haas that he had items he wanted to get rid of. Ford, Haas, and Ninci bargained about the price of some watches. Ninci tried to convince Haas that the Rolex and Gucci watches were real. Haas bought two watches, a broken chain, some silver coins, and some pieces of jade. All of these items were later identified as having belonged to Owen.

Later, Ninci gave Haas a gun, another watch, and a coin, all of which were identified as having belonged to Owen. Haas turned over all the property to the police and was granted immunity based on his promise to testify.

The police found Ford in a hotel room in Las Vegas. They recovered several pieces of property in his possession which had belonged to Owen.

Prior to trial, Ford pleaded guilty to Owen's murder. Ford did not testify at Ninci's trial.

At trial, Ninci relied on a compulsion defense and argued that Ford merely used Ninci to get a ride to Owen's house. Ninci also argued that Ford had an independent motive to kill Owen, because Owen knew Ford had killed another man, Pablo Garcia.

The jury found Ninci guilty of first-degree felony murder, robbery, and aggravated burglary. Ninci was sentenced to life for felony murder, 5 to 20 years for robbery, and 5 to 20 years for aggravated burglary, with the sentences to run consecutively.

## I. PARKING LOT STOP

One week after Owen's body was discovered, Harold Glen Ford had become the prime suspect in Owen's homicide. The police interviewed Ford's girlfriend, Elizabeth Berkley, on the morning of September 19, 1992. Detective Hansen participated in the interview of Berkley. Hansen testified at the suppression hearing that Berkley provided the police with the following information: Berkley mentioned that Ninci was an associate of Ford's. Ford had told Berkley that Ninci slit someone's throat near a bar in Westport. Berkley was afraid of Ninci and believed him to be violent. According to Berkley, Ninci and Ford had gone to a home in Leawood and visited with an individual the day of the Owen homicide. Then, Ford and Ninci went back out to the Leawood address later in the evening on that same day. When Berkley returned home from work either late on September 10, or the early morning hours of September 11, Ford had not yet returned home. Berkley told the police that Ford finally came home, told Berkley he knew "this would happen," and told Berkley that he would be in touch. Ford then picked up a bag that was already packed and left.

Two attempts were made to contact Ninci at his apartment. Later that same day, two officers in an unmarked police car returned to Ninci's address for a third time. En route to the address, the officers identified a blue Saab with a license plate number registered to Ninci. Hansen testified that Ninci was not a suspect at that time. Instead, the police wanted to find out more about Ford and Ford's whereabouts from Ninci. The officers were instructed not to contact Ninci but to wait for jurisdictional officers.

The officers followed the car to Ninci's apartment but did not stop it. Two other officers were dispatched to Ninci's apartment.

Upon arriving at Ninci's address, Ninci got out of his car and went into a building carrying laundry. A short while. later, Ninci returned to his car and drove into another parking lot in the same complex. At this point, the officers lost sight of Ninci. Apparently, Ninci got out of his car and went into an apartment building. When the other two officers arrived, the two officers at the scene informed them that Ninci's whereabouts were unknown. The four officers set up surveillance on the blue Saab. Two officers sat in an unmarked police car outside of the parking lot where they had a view of the blue Saab, and two officers sat in the parking lot near the only ingress/egress to the parking lot area. The officers observed Ninci's car for about an hour. Then, a white male came out of the apartment building and started walking toward the Saab. The officers who were observing the Saab were unsure if the man was headed toward the blue Saab, so they waited at their location until they saw the white male begin to open the door of the Saab. The officers then left their place of surveillance and went to the parking lot. As the officers were pulling into the entrance of the parking lot, Ninci was exiting the same way. The two cars met at the entrance/exit, and both cars stopped about 15 to 20 feet apart. Then, the second unmarked police car, which had been waiting in the parking lot by the entrance, pulled up behind Ninci's car.

Only one officer, Detective McClure, got out of his car. McClure identified himself as a police officer and asked if he could talk to Ninci. As McClure identified himself, Ninci got out of the car. According to Detective Hansen, Ninci was out of his car before the second police vehicle pulled up behind Ninci's car. The police car was unmarked and it was not flashing its lights or sounding its sirens. McClure asked the driver if he was Michael Ninci. The driver said he was. McClure asked for identification because he had previously seen a high school picture of Ninci and he did not think the driver looked like the picture. Ninci showed McClure his driver's license. McClure confirmed Ninci's identity and returned his driver's license. McClure then patted Ninci down for officer safety and asked him if he would go to the police department for

an interview. Ninci responded, "Sure." Ninci asked if he should ride to the police station with the officers, but McClure told Ninci that he could drive his own car to the station. McClure gave Ninci the address of the Leawood Police Department. Ninci was not sure where the police station was located, so McClure told Ninci that, if he wanted, he could follow the other police car to the station. As the three cars headed to the Leawood Police Department, Detective Hansen's car was in front, Ninci's car was in the middle, and McClure's car was behind Ninci's car. According to McClure, he never told Ninci that he was required to come to the police station, nor did he tell Ninci that he was under arrest. McClure said the contact was made to obtain more information on Ford. According to McClure, if Ninci had driven off and not gone to the police station, the officers would have taken no action except to try and re-contact Ninci later.

When McClure arrived at the Leawood Police Department, he was unsure if Ninci had arrived because he did not follow closely behind him. Upon arrival at the police station, Ninci walked into the lobby area of the police station with the two officers he had followed. Ninci was left alone in the lobby of the police station for at least 10 minutes. Ninci was sitting alone in the lobby when McClure made contact with him. At that time, McClure asked to see Ninci's driver's license again so he could copy some biographical information. McClure and Ninci walked back to the interview room and were joined shortly thereafter by Hansen. The interview started. After copying some identifying information from the driver's license, McClure laid the license on the table in front of him, within Ninci's reach. He placed it there because he was finished with it. During the interview, Ninci admitted to being present at Owen's home when Owen was killed. Ninci also signed a consent to search form during this interview. The subsequent search found several items belonging to Owen.

Ninci challenged the constitutional basis of this parking lot stop in the trial court, alleging that the police did not have probable cause or a reasonable basis for the stop. Since the stop was unconstitutional, Ninci alleged, the subsequent interview and evidence found as a result of the stop should be inadmissible at trial because

they were the fruit of the poisonous tree. According to Ninci, the trial court did not ever reach the specific argument relating to the stop. However, the trial court did make the following finding:

"The police undoubtedly had suspicions about the defendant at the time he was stopped and was asked if he would come to the Leawood police station to be interviewed regarding the homicide of Michael Owen. There is nothing that prohibits the police from asking citizens to cooperate in investigations. The fact that he was allowed to drive his own vehicle there is significant in determining whether or not the defendant was under arrest. The fact that perhaps one police car was in front and one may have been following behind is not determinative. Viewed from the rational or reasonable person's point of view, it is hard for this court to conclude that a reasonable person would have believed himself to be under arrest. When they arrived at the police station he was left alone for five minutes, again not the conduct this court believes a reasonable person would expect the police to display if that person were under arrest. During the interview he was thanked for coming in and he was asked if he had plans for that evening. He responded that he did not. The interview was initiated at 7:08 P.M. and maintained at low key until after the *Miranda* warning was given shortly after 8:00 P.M."

A trial court's denial of a motion to suppress evidence will be upheld on review if it is supported by substantial competent evidence. *State v. Garcia*, 250 Kan. 310, 318, 827 P.2d 727 (1992).

The Fourth Amendment to the United States Constitution provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

Section 15 of the Kansas Constitution Bill of Rights provides:

"The right of the people to be secure in their persons and property against unreasonable searches and seizures, shall be inviolate; and no warrant shall issue but on probable cause, supported by oath or affirmation, particularly describing the place to be searched and the persons or property to be seized."

Section 15 of the Kansas Constitution Bill of Rights provides protection identical to that provided under the Fourth Amendment to the United States Constitution. See *State v. Johnson*, 253 Kan. 356, 362, 856 P.2d 134 (1993) ("[T]he wording and scope of the two sections are identical for all practical purposes. If conduct is

prohibited by one it is prohibited by the other."); *State v. Schultz*, 252 Kan. 819, 824, 850 P.2d 818 (1993).

The first question in analyzing this issue under § 15 and the Fourth Amendment is whether the police subjected Ninci to the kind of stop contemplated by the United States and Kansas Constitutions. If not, then the Fourth Amendment and § 15 are not even implicated and questions of reasonable suspicion, probable cause, or attenuation are not considered. "There are three types of police-citizen encounters: arrests, investigatory stops, and voluntary encounters. Voluntary encounters are not considered seizures and are not covered by the Fourth Amendment." *State v. Crowder*, 20 Kan. App. 2d 117, 119, 887 P.2d 698 (1994).

While finding it hard to believe that Ninci was not a suspect when the officers encountered him in the parking lot, the trial court concluded that Ninci's interaction with the police in the parking lot was a voluntary encounter which did not implicate the Fourth Amendment. As such, the trial court found that reasonable suspicion or probable cause was unnecessary because a seizure did not occur. Thus, any lack of reasonable suspicion or probable cause did not violate the United States or Kansas Constitutions and did not require a suppression of the interview and search conducted after the parking lot encounter. Whether the stop of Ninci in the parking lot was voluntary or an illegal stop is not significant to the outcome of this case. Even assuming the stop was unconstitutional (we do not reach that issue) enough attenuation between the stop and the subsequent interview and search existed so as to allow the videotape of the interview and the search results into evidence.

In *State v. Henry*, 14 Kan. App. 2d 416, 792 P.2d 358, *rev. denied* 247 Kan. 706 (1990), an officer stopped the defendant's car without reasonable suspicion. During the unconstitutional stop, the officer asked to search the defendant's car and glove compartment. The defendant freely and voluntarily consented to the search of the vehicle and glove compartment. The officer found drugs in the glove compartment, and the defendant was charged with a drug possession crime. The defendant filed a motion to suppress the evidence found in the glove compartment, contending that the evidence was the fruit of a poisonous stop. The trial court granted

the defendant's motion. The State appealed, arguing that the defendant's "consent removes any taint from the illegal search, thereby making the evidence admissible." 14 Kan. App. 2d at 419.

In deciding the *Henry* case, the Court of Appeals cited to *United States v. Carson*, 793 F.2d 1141, 1147-48 (10th Cir.), *cert. denied* 479 U.S. 914 (1986), which provides " 'that voluntary consent, as defined for Fourth Amendment purposes, is an intervening act free of police exploitation of the primary illegality and is sufficiently distinguishable from the primary illegality to purge the evidence of the primary taint.' " 14 Kan. App. 2d at 419. The *Henry* court also noted that in deciding *Carson*, the 10th Circuit reviewed *Wong Sun v. United States*, 371 U.S. 471, 487-88, 9 L. Ed. 2d 441, 83 S. Ct. 407 (1963),

"in which the United States Supreme Court held that, although the evidence would not have come to light but for the prior illegal police conduct, such evidence is not inadmissible per se. The appropriate question is whether the evidence has been discovered by exploitation of the primary illegality or instead by sufficiently distinguishable means so as to be purged of the primary taint." 14 Kan. App. 2d at 419.

The *Carson* court decided that " ' "exploitation of the primary illegality" ' " in the context of voluntary consent means the police used the fruits of the primary illegality to coerce the defendant into granting consent. 793 F.2d at 1148; see 14 Kan. App. 2d at 419. Quoting *Carson*, the *Henry* court went on to say:

" 'Under the Fourth Amendment, evidence obtained pursuant to defendant's consent is admissible only if defendant's grant of consent is voluntary under the totality of the circumstances. *Schneckloth v. Bustamonte*, 412 U.S. 218, 248-49, 93 S. Ct. 2041, 2058-59, 36 L. Ed. 2d 854 (1973). Therefore, in a case in which evidence is obtained pursuant to consent granted subsequent to illegal police actions, the "exploitation" issue under *Wong Sun* is resolved simply by determining whether or not defendant's grant of consent was voluntary under the totality of the circumstances. The police officers' reason or basis for asking for defendant's consent is irrelevant to the "exploitation" issue unless the manner in which the police officers request consent renders defendant's consent involuntary. When defendant's grant of consent is voluntary, then there is no exploitation [because] the findings of voluntary consent and "exploitation" are mutually exclusive.' 793 F.2d at 1149." 14 Kan. App. 2d at 419-20.

Ninci contends that the primary illegality, being "boxed in" in a parking lot without reasonable suspicion by two police cars and four officers, was so exploitative that it coerced him into involuntarily consenting to the interview.

"To be voluntary, the defendant's consent must be 'unequivocal and specific' and 'freely and intelligently' given. The consent must be given without duress or coercion, express or implied. The State bears the burden of proving voluntariness. 793 F.2d at 1150 (quoting *United States v. Abbott*, 546 F.2d 883, 885 [10th Cir. 1977]). The Kansas Supreme Court recently reiterated that the question of voluntariness should be decided in light of the totality of the circumstances, considering whether the individual was threatened or coerced and whether the individual was informed of his rights. *State v. Ruden*, 245 Kan. 95, 774 P.2d 972 (1989)." 14 Kan. App. 2d at 420.

*Johnson*, 253 Kan. 356, enumerates certain factors which indicate whether consent after a primary illegality is voluntary so as to purge the primary taint or whether it is the coerced exploitation of the primary illegality. Factors which indicate that the exploitation of the primary illegality was used to coerce a consent are (1) if the officers used deception to gain consent, and (2) if the defendant had no knowledge that he could refuse to consent. Factors which indicate that the consent was voluntary and purged the primary taint are (1) if the officers' behavior was not threatening or coercive, (2) if the defendant indicated intent to consent, (3) if the defendant has an education, (4) if the defendant is not under the influence of intoxicants. See 253 Kan. at 366-67.

Under the totality of the circumstances, it appears that Ninci's consent was voluntary. While the police did not inform Ninci that he did not have to consent to the interview, the officers did not use deception to gain Ninci's consent. Further, the officers' behavior was not threatening or coercive. On the videotape, Ninci appears to be intelligent and articulate. None of the officers believed that Ninci was drunk during the interview, and Ninci indicated his intent to consent by answering, "Sure," when the police asked him if he would go to the Leawood police station for questioning. Thus, these factors weigh in favor of finding that Ninci's consent to the interview was voluntary. Further, at the interview,

the officers thanked Ninci for coming in, indicating that he had voluntarily consented to the interview.

Ninci voluntarily agreed to go to the police station for questioning. Once at the interview, Ninci voluntarily signed the consent to search form. The primary stop was not exploited so as to coerce Ninci into consenting to the interview or the search. Instead, Ninci voluntarily consented to the interview and the search, and this consent constituted an intervening act which was sufficiently distinguishable from the primary stop so as to purge the interview and search of any taint. As such, the interview and the search were so attenuated from the parking lot stop that they did not constitute the fruit of the (possibly) poisonous stop. The trial court properly refused to suppress this evidence. The evidence was either admissible because the stop itself was properly conducted with reasonable suspicion or because the taint of the unconstitutional stop was purged by Ninci's voluntary consent to the interview and search.

## II. POLICE STATION INTERVIEW

Ninci's interview at the police station began at approximately 7 p.m. and ended at approximately 10:30 p.m. The police did not read him his *Miranda* rights until shortly after 8 p.m. During the first hour of the interview, Ninci admitted visiting Owen at his home but denied knowing Ford or having any involvement in Owen's murder. During the later 2 ½ hours of the interview, Ninci admitted to knowing Ford and to being present when Ford killed Owen, but he denied having any intent or plan to kill Owen with Ford.

In this issue, Ninci argues that the first hour of his interview at the police station should not have been admitted into evidence at trial because it was conducted without first having provided him with *Miranda* warnings. Ninci also argues that his confession in the later 2 ½ hours of the interview, after the *Miranda* warnings were provided, should not have been admitted into evidence at trial because it was involuntarily extorted by fear and hope of benefit. Since the interview should not have been admitted into evidence, Ninci also contends that all of the evidence obtained as a result of

the interview (he signed a consent to search form during the interview)' should not have been admitted into evidence either.

The Fifth Amendment to the United States Constitution provides in part that "[n]o person . . . shall be compelled in any Criminal Case to be a witness against himself." Section 10 of the Kansas Constitution Bill of Rights guarantees this same right. In order to protect this right, the United States Supreme Court, in *Miranda v. Arizona,* 384 U.S. 436, 444, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966), held:

"[T]he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way."

Based on *Miranda,* Ninci filed a motion with the trial court to suppress the first hour of his statement because he had not been read his *Miranda* rights until an hour into the interview. The trial court denied Ninci's motion, finding that *Miranda* warnings were not necessary because Ninci was not in custody at the time of the interview; thus, a custodial interrogation did not occur. In so holding, the trial court stated:

"The police undoubtedly had suspicions about the defendant at the time he was stopped and was asked if he would come to the Leawood police station to be interviewed regarding the homicide of Michael Owen. There is nothing that prohibits the police from asking citizens to cooperate in investigations. The fact that he was allowed to drive his own vehicle there is significant in determining whether or not the defendant was under arrest. The fact that perhaps one police car was in front and one may have been following behind is not determinative. Viewed from the rational or reasonable person's point of view, it is hard for this court to conclude that a reasonable person would have believed himself to be under arrest. When they arrived at the police station he was left alone for five minutes, again not the conduct this court believes a reasonable person would expect the police to display if that person were under arrest. During the interview he was thanked for coming in and he was asked if he had plans for that evening. He responded that he did not. The interview was initiated at 7:08 P.M. and maintained at low key until after the *Miranda* warning was given shortly after 8:00 P.M. After the *Miranda* warning was given, statements made by the defendant in the first hour were utilized to accuse the defendant of being dishonest. Detective McClure

confronted the defendant with a picture of Ford that he had been shown in the first hour and told the defendant in words to the effect that we know you know this person and that you are being dishonest in telling us that you don't know this person. From there the defendant began to disclose his involvement in the Owen homicide.

"In applying the case law to the facts of this case, it would appear that the defendant in this case voluntarily drove his vehicle to the police station. The total interview of the defendant began at 7:08 P.M. and ended at approximately 10:30 that evening. The interview of the defendant was low key and for the most part non-confrontive or aggressive until the request for consent to search was presented to the defendant. There is no evidence that the defendant was intoxicated nor any evidence that the defendant was in any way discomforted to the extent that he was coerced into making these statements. During the first few minutes of the interview the defendant began to admit that he had had contact with the decedent during the week of his death and in the first hour when he denied that he recognized an individual with whom he was known to have associated with, undoubtedly the police focused on him as a prime suspect. It was at this time that the defendant was given his *Miranda* warning. In applying the case law to the facts of this particular case, the Court concludes that the totality of the circumstances would lead a reasonable person to believe under the same or similar circumstances that they were not under arrest and were free to leave at any time up until the time they began to admit their specific involvement in the crime being investigated. Therefore, the Court would decline to suppress any statements made by the defendant . . . ."

Ninci appeals the trial court's denial of his motion to suppress the first hour of his interview.

"The admissibility of statements made by a defendant before *Miranda* warnings are given depends on whether the statements are the result of a custodial interrogation or an investigatory interrogation. . . .

. . . .

"[T]he general rule [is] that any statement made by a person during custodial police interrogation cannot, over the person's objection, be admitted in evidence against the person at trial, even though the statement may in fact be wholly voluntary, unless the police, before interrogation, informed the person that he or she has a right to remain silent, that any statement the person makes may be used as evidence against that person, and that the person has a right to the presence of an attorney, either retained or appointed." *State v. Lewis,* 258 Kan. 24, 35-36, 899 P.2d 1027 (1995).

The determinative question here is whether the first hour of the interview, before the *Miranda* warnings were provided, was an in-

terrogation, and, if so, was it a custodial interrogation or an investigatory interrogation. Interrogation "refers not only to express questioning but also to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminatory response from the suspect." *Lewis*, 258 Kan. at 35. During the first hour of the interview, the officers asked Ninci if he recognized a picture of Ford and why his car was seen at Owen's house the same week as the murder. The officers should have known that these questions were reasonably likely to elicit an incriminatory response from Ninci. Thus, it is obvious that Ninci was subjected to interrogation during the first hour that he was at the police station before he had been read his *Miranda* rights. The next question is whether such interrogation qualified as custodial interrogation or investigatory interrogation.

Based on the objective standard of whether a reasonable person would feel free to leave if placed in the same situation, custody is determined by looking to the following factors, in no particular weight or order of importance:

" 'when and where [the interrogation] occurred, how long it lasted, how many police were present, what the officers and the defendant said and did, the presence of actual physical restraint on the defendant or things equivalent to actual restraint such as drawn weapons or a guard stationed at the door, . . . whether the defendant was being questioned as a suspect or a witness . . . how the defendant got to the place of questioning—whether he came completely on his own, in response to a police request, or escorted by police officers . . . [and] what happened after the interrogation—whether the defendant left freely, was detained or arrested. . . .' " *State v. Fritschen*, 247 Kan. 592, 603, 802 P.2d 558 (1990).

In ruling on Ninci's motion to suppress, the trial court found that the interrogation at the police station occurred in an noncustodial setting. As such, the court held that the *Miranda* warnings were not necessary and failure to give them until an hour into the interview did not require the first hour of the interview to be suppressed.

"If the findings of the trial court on a motion to suppress evidence are based upon substantial evidence, this court on review will not substitute its view of the evidence for that of the trial court." *State v. Garcia*, 250 Kan. 310, Syl. ¶ 2, 827 P.2d 727 (1992).

The findings of the trial court that the interview at the police station, at least the first hour of it, was noncustodial and did not need to be suppressed for failure to provide *Miranda* warnings were based upon substantial evidence.

The interrogation at the police station took place in an interview room. The interview lasted approximately 3 ½ hours, but the un-*Mirandized* portion of the interview only lasted an hour. Two police officers were present, but each one left the room several times for various reasons. The communication between the officers and Ninci during this first hour of the interview was cordial and friendly. The officers asked Ninci if he had any plans for the rest of the night, which indicated that the interview could have been postponed to a more convenient time for Ninci if necessary. While the officers stated that they were trying to clear Ninci as a "suspect" and that they would "cut [him] loose" later in the evening, the officers also thanked Ninci for voluntarily coming in and helping them with the investigation. After finishing a certain line of questioning, the officers provided Ninci with a beverage at his request, and asked him if he wanted some cake. Ninci was not physically restrained in any way. He wore no handcuffs and no guards were stationed at the door. The police obviously wanted to question Ninci as a potential suspect, but the officers testified that they also wanted to talk to Ninci to find out more about Ford. Ninci voluntarily came to the police station in his own car in response to a police request. Ninci claims that being blocked in in the parking lot put pressure on him to go to the police station, but he acquiesced at the interview that he had voluntarily agreed to come to the police station.

One officer asked for Ninci's driver's license when the interview began. The officer did not directly give the license back to Ninci. However, a few minutes into the interview, the officer placed Ninci's license on the table between the officer and Ninci, within Ninci's reach. When Ninci asked to have his license back after an hour had passed, the officer readily handed it back to him. When the interview ended, Ninci was arrested because he had admitted to being involved in the murder of Owen.

We hold there is substantial evidence to support the trial court's conclusion that a reasonable person would have felt free to leave under the same circumstances, at least up until the time Ninci started confessing to the crime. Thus, Ninci was not in custody during the first hour of the police interrogation, and this first hour of the interview constituted only an investigatory interrogation, not a custodial interrogation. Since Ninci was not in custody at this time, the officers were not required to provide him with *Miranda* warnings. As such, the failure of the officers to provide Ninci with *Miranda* warnings during the first hour of the interview does not require the suppression of his statements taken during this first hour of the interview. Substantial competent evidence supports the trial court's conclusion that the first hour of the interview was admissible. See *State v. Haddock*, 257 Kan. 964, 897 P.2d 152 (1995); *State v. Fritschen*, 247 Kan. 592, 802 P.2d 558 (1990); and *State v. Jones*, 246 Kan. 214, 787 P.2d 726 (1990).

Because the first hour of the interrogation at the police station, before Ninci's *Miranda* rights were read, was not custodial and was admissible at trial, the resulting confession in the last 2 hours of the interrogation, after the *Miranda* warnings were provided, cannot be considered tainted by the prior un-*Mirandized* statement. However, Ninci asserts that the later 2 ½ hours of the interview, after the *Miranda* warnings were provided, are inadmissible, regardless of the admissibility of the first hour of the interview, because Ninci's confession was involuntary extorted by fear and hope of benefit.

Ninci contends that the officer who read him the *Miranda* warnings treated the warnings as an inconvenience and as an interruption in the flow of questioning. The officer told Ninci that the officer's boss asked him to read the warnings to Ninci. In fact, an assistant district attorney who was observing the interview recommended that the warnings be given. The officer told Ninci to read the *Miranda* waiver aloud to himself, which Ninci did, and told Ninci where to sign the waiver. Ninci signed the waiver, and the officer continued questioning him.

In order for the waiver of *Miranda* rights to be knowing and voluntary, the United States Supreme Court held that two requirements must be met:

"First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran v. Burbine*, 475 U.S. 412, 421, 89 L. Ed. 2d 410, 106 S. Ct. 1135 (1986).

Also, throughout these last 2 ½ hours of the interview, the officers told Ninci "now is the time to come clean" and "you can do some things to help yourself now." At 9:30 p.m., when Ninci indicated he was very scared of Ford and feared for his life, the officers told Ninci that Ford "knows you know too much, we can help you on that, but it has to be a two way street. We are willing to do what we can to keep you safe, but we can't do it unless we know exactly what is going on." Ninci was told that if he did not cooperate, then the officers really did not care what happened to him. According to Ninci, the officers indicated that it would help him if he confessed.

" 'It is well settled that an extrajudicial confession will not be received in evidence unless it has been freely and voluntarily made. If it has been extorted by fear or induced by hope of profit, benefit, or amelioration, it will be excluded as involuntary. However, the advice or admonition to the defendant to speak the truth, which does not import either a threat or benefit, will not make a following confession incompetent.' " *State v. Newfield*, 229 Kan. 347, 359, 623 P.2d 1349 (1981) (quoting *State v. Kornstett*, 62 Kan. 221, 227, 61 Pac. 805 [1900]).

Ninci contends that, even after having been read the *Miranda* warnings, his confession in the last 2½ hours of the interview was not voluntary because his waiver of the *Miranda* rights was not voluntary and because his confession was coerced by extortion and hope of benefit.

After conducting a hearing on Ninci's motion to suppress his statement, the trial court denied the motion, finding that the statement was freely and voluntarily given. The videotape of the entire interview was admitted at trial. "When a trial court conducts a full hearing on the admissibility of an extrajudicial statement by an accused, determines the statement was freely and voluntarily given,

and admits the statement into evidence at the trial, an appellate court accepts that determination if it is supported by substantial competent evidence." *State v. Morris*, 255 Kan. 964, 971, 880 P.2d 1244 (1994).

The trial court's conclusions that Ninci's statement in the last 2½ hours of the interview was freely and voluntarily given and that Ninci freely and voluntarily waived his *Miranda* rights are supported by substantial and competent evidence. Ninci paid attention while the rights were being read to him and nodded in understanding. From the videotape, Ninci appears to be an articulate and intelligent man. He did not appear to be intoxicated with drugs or alcohol at the time of the interview. After the officer read the *Miranda* rights to Ninci, he had Ninci read the waiver of *Miranda* rights out loud. Ninci signed the waiver without coercion or threat. There is no indication that Ninci did not voluntarily and knowingly waive his *Miranda* rights before he began answering questions.

It is also true that officers encouraged Ninci to tell the truth because they thought he would be better off if he did. These comments did not amount to a promise of benefit or to extortion in order to get Ninci to confess. The officers merely advised and admonished Ninci to speak the truth. The officers were questioning him in order to solve a murder. The officers were not required to have the defendant's best interests at heart or even be nice to him during the questioning. The officers were required to follow the law so that Ninci's confession was voluntarily and knowingly made. The police did not violate the voluntary and knowing limits when they questioned Ninci. The discussion was very cordial, up until the officers asked Ninci to sign a consent to search form. The officers gave Ninci something to drink and offered to give him something to eat. The officers did not threaten Ninci or promise a benefit in order to make Ninci confess. There is substantial evidence to support the trial court's conclusion that Ninci knowingly and voluntarily waived his *Miranda* rights and knowingly and voluntarily confessed to the murder of Owen. Thus, the last 2½ hours of the interview were properly admitted at trial, just as the first hour was. Since the interview was properly admitted into evidence at trial, all the evidence that was discovered as a result of Ninci's

agreement to sign a consent to search form during the interview was also properly admitted into evidence at trial.

## III. RETROACTIVE APPLICATION

During the interview, the officers asked Ninci to sign a consent to search form. At this time, Ninci said, "I'm just asking you, . . . I know I'm trying to help you out, . . . I mean, I mean, I don't know, do I need to have a lawyer right now?" The officers ignored this question and continued to ask Ninci to sign the form, which he did. Evidence harmful to Ninci was found as a result of the search.

This issue has heretofore been before the Court of Appeals. The procedural history is as follows: Ninci filed a motion to suppress the statement because his request for an attorney was not honored. The trial court granted this motion and suppressed the admission of the interview at the point Ninci asked if he needed a lawyer. The trial court held that the police should have stopped asking all questions when Ninci made his ambiguous request for counsel, except for questions to clarify whether Ninci really wanted an attorney.

The State appealed the trial court's ruling. The Court of Appeals affirmed the trial court's decision. *State v. Ninci*, 19 Kan. App. 2d 192, 865 P.2d 1078 (1993), *rev. denied* 254 Kan. 1009 (1994). In June 1994, the United States Supreme Court issued its decision in *Davis v. United States*, 512 U.S. 452, 129 L. Ed. 2d 362, 114 S. Ct. 2350 (1994), which addressed, for the first time, the issue of ambiguous requests for counsel. *Davis* held that:

"the suspect must unambiguously request counsel. . . . [H]e must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney. If the statement fails to meet the requisite level of clarity, *Edwards* [*v. Arizona*, 451 U.S. 477, 68 L. Ed. 2d 378, 101 S. Ct. 1880, *reh. denied* 452 U.S. 973 (1981)] does not require that the officers stop questioning the suspect." 512 U.S. at 459.

Thus, *Davis* does not require the police to stop asking questions upon an ambiguous request for counsel and clarify the suspect's desire for counsel. Under *Davis*, the police may continue asking

questions and ignore all requests for counsel unless the requests are unambiguous. Based on the *Davis* holding, the State asked the trial court to reconsider its ruling which suppressed the videotaped interview from the point when Ninci's ambiguous request for counsel was ignored. The trial court declined to do so.

However, on September 16, 1994, this court issued its ruling in *Morris*, 255 Kan. 964. *Morris* adopted the United States Supreme Court ruling in *Davis* and expressly overruled *Ninci's* requirement that police officers ask clarifying questions after an ambiguous request for counsel. Based on the decision in *Morris*, the State moved again for reconsideration of the trial court's suppression ruling. The trial court reconsidered and allowed the entire videotape to be admitted into evidence at trial.

Ninci contends that the original Court of Appeals opinion, which affirmed the trial court's suppression of the interview tape at the point of the ambiguous request for counsel, was the "law of the case" and should have governed the trial. Further, Ninci contends that it was fundamentally unfair to retroactively ratify the conduct of the officers in the present case by permitting the State to rely on a "new constitutional law" that was detrimental to Ninci. According to Ninci, allowing the retroactive application of "new constitutional law" which was detrimental to him violated his right to a fair trial, his due process rights, and his Fifth Amendment right to counsel.

Ninci did not raise this issue to the trial court when the trial court reconsidered its suppression of the interview tape and retroactively applied the new ambiguous request rule under *Morris*. "A defendant cannot raise points on appeal which were not presented to the trial court." *State v. Johnson*, 253 Kan. 75, 91, 853 P.2d 34 (1993). In any event, the argument has no merit.

## IV. AMBIGUOUS REQUEST FOR COUNSEL

During the interview, after Ninci had been given his *Miranda* warnings, the police asked Ninci to sign a consent to search form. The police told Ninci that if he would sign the form, it would indicate his willingness to cooperate, and that if he would not sign the form, the authorities would simply obtain a search warrant. At

this point, Ninci said, "I'm just asking you . . . I mean, I mean, I don't know, *do I need to have a lawyer right now*? I understand this and I want to help." (Emphasis added.) The officers did not respond to Ninci's inquiry. Instead, the officers ignored the inquiry, continued the interview, and obtained the signed consent to search form. See *Ninci*, 19 Kan. App. 2d at 194.

As set forth above, Ninci filed a motion to suppress the statement, alleging that his Fifth Amendment right to counsel had been violated because the officers continued to question him after he had requested a lawyer. The trial court found that Ninci's statement was, "at the minimum," an ambiguous request for consent and suppressed the interview tape from that statement on. As discussed in the previous issue, the trial court later reversed its suppression of any portion of the tape, but the trial court did not reverse its finding that Ninci's statement was an ambiguous, as opposed to unambiguous, request for counsel at this time.

After the trial court reversed its suppression ruling, based on *Davis* and *Morris*, Ninci asked the trial court to change its conclusion and find that his request for counsel was a clear and unambiguous request. As such, Ninci asked the trial court to find that the officers were required to stop questioning him upon such request and not resume questioning until he had a lawyer or had reinitiated communication himself. The trial court refused to reconsider its conclusion that Ninci's request for counsel was ambiguous. Therefore, under *Davis* and *Morris*, the police were not required to clarify Ninci's ambiguous request for counsel and were allowed to ignore the request without violating Ninci's Fifth Amendment right to counsel.

Ninci appeals the trial court's conclusion that his request for counsel was ambiguous. "Invocation of the *Miranda* right to counsel 'requires, at a minimum, some statement that can reasonably be construed to be an expression of a desire for the assistance of an attorney.' " *Davis*, 512 U.S. at 459 (quoting *McNeil v. Wisconsin*, 501 U.S. 171, 178, 115 L. Ed. 2d 158, 111 S. Ct. 2204 [1991]).

Ninci asserts that his question, "[D]o I need to have a lawyer right now?" could reasonably be construed to be an expression of a desire for the assistance of an attorney by the officers and by the

court. According to Ninci, just because the officers ignored his request for an attorney, continued to press him to sign a consent form, and just because he did sign the consent form does not mean that his request for an attorney was ambiguous. Ninci asserts that the officers ignored his clear and unambiguous request for counsel without waiting for him to be represented by counsel or reinitiate communication, thereby violating his Fifth Amendment right to counsel. Thus, Ninci contends that the portion of his interview that occurred after his clear request for counsel was ignored should be suppressed and all the evidence gathered as a result of that portion of the interview should be suppressed under the "fruit of the poisonous tree" doctrine.

The standard of review on this issue is set out by this court in *State v. Longbine*, 257 Kan. 713, 896 P.2d 367 (1995).

"We have stated that when reviewing a trial court's suppression of evidence, the appellate courts normally give great deference to the factual findings of the trial court. Even though great deference is given to the factual findings of the trial court, the ultimate determination of the trial court's suppression of evidence is a legal question requiring independent appellate determination." *Longbine*, 257 Kan. at 717 (citing *State v. Vandiver*, 257 Kan. 53, Syl. ¶ 6, 891 P.2d 350 [1995]).

Here, the trial court made a factual finding that Ninci's request for counsel was ambiguous. The Court of Appeals found that the trial court's conclusion was supported by substantial competent evidence. The trial court's conclusion and the Court of Appeals' conclusion that the defendant's request for counsel was ambiguous are supported by substantial competent evidence.

Ninci did not directly ask for an attorney or indicate in any way that he specifically desired an attorney. The defendant's question cannot " 'reasonably be construed to be an expression of a *desire* for the assistance of an attorney.' " (Emphasis added.) *Davis*, 512 U.S. at 459. Ninci simply asked the officer whether the officer thought Ninci should get an attorney. Rather than give Ninci unauthorized legal advice, the officer chose to ignore the question.

Ninci's request for counsel was ambiguous. Under *Davis*, a defendant does not implicate his or her Fifth Amendment rights unless an unambiguous request for counsel has been made. Thus, Ninci's Fifth Amendment right to counsel was not implicated by

his ambiguous request for counsel. The officer was not required to stop questioning Ninci at the point Ninci inquired about needing an attorney, either to clarify the comment, wait for an attorney, or wait for Ninci to reinitiate communication. As such, the portion of the interview after Ninci made the ambiguous attorney request was properly admitted at trial, and all the evidence found as a result of this portion of the interview was also properly admitted at trial.

## V. MERE ASSOCIATION

The jury was instructed on liability as an aider and abettor in jury Instruction No. 11, which provided:

"A person who either before or during its commission intentionally aids or abets another to commit a crime with intent to promote or assist in its commission is criminally responsible for the crime committed regardless of the extent of the defendant's participation, if any, in the actual commission of the crime."

See PIK Crim. 3d 54.05. Defense counsel submitted the following proposed instruction to the court: "Mere association or mere presence in the vicinity of the crime are themsel[ves] insufficient to establish guilt as a participant or aider and abettor." This is not a pattern jury instruction. However, Ninci points out that this is a well-settled principle of law as set out in the Comment to PIK Crim. 3d 54.05 and *State v. Green*, 237 Kan. 146, Syl. ¶ 4, 697 P.2d 1305 (1985).

The trial court declined to give Ninci's proposed jury instruction. Ninci alleges that the trial court's failure to instruct on Ninci's theory of defense violated due process and requires reversal of Ninci's convictions.

This issue has been addressed before in *State v. Scott*, 250 Kan. 350, 827 P.2d 733 (1992), and *State v. Hunter*, 241 Kan. 629, 740 P.2d 559 (1987). The *Scott* court, quoting *Hunter*, provided:

" 'Although [this court has] held that mere association with principals is not sufficient to establish guilt as an aider and abettor, [we have not] mandated the giving of such an instruction. . . . [We have] held that the PIK [Crim. 2d 54.05] instruction given clearly informed the jury that intentional acts by a defendant must be proved to convict for aiding and abetting and, thus, proof of mere association or presence would be insufficient to convict. Therefore, the refusal to give defendant's requested instruction was not error.' " 250 Kan. at 361 (quoting *Hunter*, 241 Kan. at 639).

The *Scott* court also quoted *State v. Crabtree*, 248 Kan. 33, 805 P.2d 1 (1991): " 'Error cannot be predicated on the refusal to give specific instructions where those which were given cover and include the substance of those refused.' " 250 Kan. at 361 (quoting *Crabtree*, 248 Kan. 33, Syl. ¶ 6). Neither *Scott* nor *Crabtree* found error in the trial court's refusal to give the defendant's requested "mere association" instruction. *Scott*, 250 Kan. at 361; *Crabtree*, 241 Kan. at 639.

Ninci acknowledges the *Scott* and *Hunter* cases but contends that the trial court erred in refusing to give his proposed "mere association" instruction despite these two cases. In support of his argument, Ninci points out that the jury was given the following Instruction No. 9, which is PIK Crim. 3d 54.01:

"Ordinarily a person intends all of the usual consequences of his voluntary acts. This inference may be considered by you along with all the other evidence in the case. You may accept or reject it in determining whether the State has met its burden to prove the required criminal intent of the defendant. This burden never shifts to the defendant."

It is true that under Instruction No. 9, the jury was allowed to infer that Ninci intended to do all of the usual consequences of his voluntary act in "hanging out" with Ford. However, the jury was also allowed to reject this inference if it chose to do so. Even if the jury accepted this inference, it was only allowed to assume that Ninci intended the *usual* consequences of voluntarily "hanging out" with Ford. Aggravated battery, robbery, and felony murder are not the usual consequences of hanging out with a friend. Thus, the jury could not and would not assume that Ninci intended to commit these crimes and aid and abet in committing these crimes just because he was "hanging out" with Ford. PIK Crim. 3d 54.05 specifically requires the jury to find that Ninci *intentionally* aided and abetted in committing these crimes. This made it clear to the jury that mere association with Ford, without intent to aid and abet in the crimes, was not enough evidence to find Ninci guilty of aiding and abetting in these crimes.

The Comment to PIK Crim. 3d 54.05 has been amended since the trial in this case and provides:

"Mere association with principals who actually commit the crime or mere presence in the vicinity of the crime is insufficient to establish guilt as an aider and abettor. *State v. Green*, 237 Kan. 146, 697 P.2d 1305 (1985). *This language from* Green, *however, may properly be refused as an additional instruction by the trial judge, since PIK [Crim.] 3d 54.05 clearly informs the jury that intentional acts by a defendant are necessary to sustain a conviction for aiding and abetting. State v. Hunter*, 241 Kan. 629, 639, 740 P.2d 559 (1987); *State v. Scott*, 250 Kan. 350, 361, 827 P.2d 733 (1992)." PIK Crim. 3d 54.05 (1994 Supp.), Comment. (Emphasis added.)

## VI. PROSECUTOR COMMENT

The Fifth Amendment to the United States Constitution guarantees, in part, that "[n]o person . . . shall be compelled in any Criminal Case to be a witness against himself." Section 10 of the Kansas Constitution Bill of Rights also protects this right. In *Griffin v. California*, 380 U.S. 609, 615, 14 L. Ed. 2d 106, 110, 85 S. Ct. 1229, *reh. denied* 381 U.S. 957 (1965), the United States Supreme Court held that the Fifth Amendment "forbids either comment by the prosecution on the accused's silence or instructions by the court that such silence is evidence of guilt." See *State v. Reeves*, 224 Kan. 90, 93, 577 P.2d 1175 (1978). This constitutional constraint is codified in K.S.A. 60-439:

"If a privilege is exercised not to testify or to prevent another from testifying, either in the action or with respect to particular matters, or to refuse to disclose or to prevent another from disclosing any matter, the judge and counsel may not comment thereon, no presumption shall arise with respect to the exercise of the privilege, and the trier of fact may not draw any adverse inference therefrom. In those jury cases wherein the right to exercise a privilege, as herein provided, may be misunderstood and unfavorable inferences drawn by the trier of the fact, or may be impaired in the particular case, the court, at the request of the party exercising the privilege, may instruct the jury in support of such privilege."

During closing argument, the State reviewed in great detail certain aspects of Ninci's videotaped statement. The State then commented:

"When you look at the whole picture, folks, he knew and he agreed and he was there and he involved himself. The defendant then says, well, you know, if you think that I really knew what was going to happen that night or I agreed to involve myself in this thing—you know—if you believe that, then I want you to think that the only reason I did that was because Glen Ford made me do it. That the only reason that I danced with the devil is because Glen Ford made me do it. The

defendant says I acted under threat of continuous, immediate and imminent infliction of death and great bodily harm and that instruction has been included in your instruction packet under Instruction No. 22 when he says I'm using the defense of compulsion.

"Well, you know, what, folks, there's no evidence of that. *The only evidence that you have out of Mike Ninci's mouth is that he didn't know what Glen was going to do.*

. . . .

"[T]he only evidence that you hear from the defendant's taped statement is that he was thinking about the possibility of getting killed. He was thinking about it. And again, folks, you got to look at that from the first view of the defendant's statement. And that is that the defendant is doing anything he can to manipulate the truth, to escape responsibility for that."

Ninci's counsel objected and moved for a mistrial because he thought the prosecutor's comment was an improper reference to Ninci's decision to not take the stand and testify. The State asserted that the comment was not improper because it referred only to Ninci's videotaped statement, which was played to the jury. The trial court agreed and denied the motion.

A prosecutor commits error when " 'the language used was manifestly intended or was of such a character that the jury would naturally and necessarily take it to be a comment on the failure of the accused to testify.' " *State v. Ponds*, 227 Kan. 627, 632, 608 P.2d 946 (1980) (quoting *State v. Henderson*, 226 Kan. 726, 736, 603 P.2d 613 [1979]). We agree with the trial court that the prosecutor's comment was not of such a character that the jury would have naturally and necessarily understood the statement to be a comment on Ninci's failure to testify. When read in context, it becomes obvious that the prosecutor's closing argument mostly consisted of a dissection of Ninci's videotaped statement. When the prosecutor stated that there was no evidence "out of Mike Ninci's mouth" as to how Ford compelled him to commit the crimes charged, the prosecutor was referring to the fact that Ninci never told the police on the videotape how Ford compelled him to commit the crimes. The State was not referring to the fact that Ninci had never testified on the stand at trial, as prohibited by *Griffith*. This interpretation of the statement is supported by the

prosecutor's comments immediately following the defendant's objection to the statement. At that time, the prosecutor said,

"[T]he only evidence that you hear from the defendant's *taped statement* is that he was thinking about the possibility of getting killed [by Ford if he did not help commit the crimes against Owen]. He was thinking about it. And again, folks, you have to look at that from the first view of the defendant's statement. And that is that the defendant is doing anything he can to manipulate the truth, to escape responsibility for that."

We do not find error concerning this issue.

## VII. AUTOPSY PHOTOS

Prior to the pathologist's testimony, the defense counsel objected to autopsy photos that the State planned to enter into evidence during the pathologist's testimony. Three photos were specifically objected to on appeal. Two photos depicted the wounds to Owen's head. The third photo depicted the wound to Owen's neck, but the photo also depicted an empty skull. Ninci alleged that the photos were cumulative and gruesome. The trial court overruled the objection.

The admission of photographs in a homicide case is a matter within the trial court's discretion, and that decision will not be disturbed absent a showing of abuse of discretion by the trial court. *State v. Harris*, 259 Kan. 689, 710, 915 P.2d 758 (1996).

"The law is well-settled in this state that in a crime of violence which results in death, photographs which serve to illustrate the nature and extent of the wounds inflicted are admissible when they corroborate the testimony of witnesses or are relevant to the testimony of a pathologist as to the cause of death, even though they may appear gruesome." *State v. Sheehan*, 242 Kan. 127, Syl. ¶ 8, 744 P.2d 824 (1987).

The photos of Owen's head injuries were necessary to corroborate the testimony of the pathologist, who testified that Owen suffered a comminuted skull fracture which would have rendered Owen unconscious and could have been fatal in and of itself. Further, the photo with the empty skull was introduced not to show the empty skull but to show Owen's neck injury. The photo indicated how deep and long the cut was on Owen's neck. All three photos depicted the nature of the injuries suffered and were rel-

evant to the testimony of the pathologist. Only two other autopsy photos were shown at trial. These two photos are not objected to on appeal. One of the photos showed how Owen looked before the autopsy began and depicted the wound on the front of his neck. The last photo showed bruises on Owen's face. None of the photos were repetitious or without probative value. Thus, the trial court did not abuse its discretion in admitting any of these photos into evidence.

## VIII. VIDEOTAPED INTERVIEW

The State planned to introduce the videotape of Ninci's interview at the police station into evidence at trial, including all the statements made by the questioning police officers, McClure and Henson. However, during the course of the case, McClure became very ill with Lou Gehrig's disease and was unable to appear as a witness at the trial. Since McClure was not able to appear as a witness at the trial, Ninci argued that all of McClure's statements and questions on the videotape would qualify as hearsay and should not be admitted at trial pursuant to K.S.A. 60-460. Ninci filed a motion to redact, requesting that McClure's statements and questions on the videotape and Ninci's responses to McClure's questions be redacted as inadmissible hearsay pursuant to K.S.A. 60-460.

The trial court denied Ninci's motion based on its conclusion that "the statements of McClure during the course of that interview are not being offered for the truth of the matter stated." The trial court instructed the jury not to consider McClure's statements for the truth of the matter asserted. The jury was instructed that "only the responses of Mr. Ninci would be considered as evidence in this matter since Mr. McClure is not available." Based on this ruling, the entire videotape was introduced into evidence without redaction. Ninci appeals the trial court's ruling.

A trial court is given considerable latitude in determining the admissibility of a statement under K.S.A. 60-460. See *State v. Sanders*, 258 Kan. 409, 420, 904 P.2d 951 (1995). The standard of appellate review concerning the admission of hearsay evidence is

abuse of trial court discretion. *State v. Bird*, 238 Kan. 160, 174; 708 P.2d 946 (1985).

McClure's statements were not offered to prove the truth of the matters asserted. Instead, the statements were offered so that the jury would be able to place Ninci's answers and statements in the appropriate context so that they were understandable. *Cf., State v. Getz*, 250 Kan. 560, Syl. ¶ 2, 830 P.2d 5 (1992); *Prairie State Bank v. Hoefgen*, 245 Kan. 236, 243, 777 P.2d 811 (1989).

In *Getz*, the court stated that " '[e]xtrajudicial statements offered not to prove the truth of the statements, but to prove that the statements were made, are not inadmissible as hearsay.' " 250 Kan. at 567 (quoting *Prairie State Bank*, 245 Kan. 236, Syl. ¶ 1). The *Getz* court also stated that " '[i]f an utterance previously made out of court is offered in evidence merely for the purpose of establishing what was then said, and not for the purpose of establishing the truth of the statement, the testimony is not hearsay. If relevant it is admissible through the person who heard it.' [Citation omitted.] " *Getz*, 250 Kan. at 567. In *Getz*, the court found that there was a purpose for admitting the statement other than to prove the truth of the matter asserted. The statement was admitted to prove its effect on the listener, the defendant, and was relevant to the defendant's intent when committing the charged acts. 250 Kan. at 568-69.

In *Prairie State Bank*, this court addressed nonhearsay declarations or out-of-court statements which are offered not to prove the truth of the matter stated, but for some other reason. The court cited an example of a nonhearsay declaration as a statement "offered to show the reaction of one to whom the statement is made." 245 Kan. at 243.

The trial court instructed the jury not to consider McClure's statements for the truth of the matter asserted. The jury was instructed that "only the responses of Mr. Ninci would be considered as evidence in this matter since Mr. McClure is not available." There is no reason to believe the jury disobeyed this instruction. The trial court found that the State did not offer McClure's out-of-court statements on the videotape to prove the truth of the matter asserted by McClure. Thus, the trial court found that the state-

ments did not qualify as hearsay and were properly admitted into evidence at trial. The trial court did not abuse its discretion in reaching this conclusion.

Ninci argues that even if the statements were properly admitted under K.S.A. 60-460, their admission might still have violated Ninci's constitutional right to confrontation. See *Bird*, 238 Kan. at 174; *State v. Myers*, 229 Kan. 168, 171, 625 P.2d 1111 (1981).

Ninci is mistaken in arguing that the court must consider the Confrontation Clause of the United States Constitution under this issue. Such consideration is only necessary when hearsay evidence is admitted into a criminal trial under one of the hearsay exceptions. Here, McClure's out-of-court statements were not offered to prove the truth of the matters stated. Thus, the statements did not qualify as hearsay at all. As such, a hearsay exception was not necessary to admit these statements at trial, and the Confrontation Clause was never implicated. Hence, a discussion of the Confrontation Clause is unnecessary.

## IX. LEG BRACE

Just before opening statements began, the attorneys discussed the fact Ninci was wearing a leg brace:

"[DEFENSE COUNSEL]: Judge, the only thing again that brace is on Mike's leg. Mike has been in custody two and a half years. He's not going anywhere. I think it telegraphs to the jury that he's in custody. We have got a burly officer here if anything is going to happen, but I would just ask the Court to allow us to remove the brace.

"THE COURT: Absent some compelling reason, the Court would not involve itself in the control of prisoners by the deputies. I think they are trained and skilled. I think it is unobtrusive. Certainly the Court is not aware of any exaggeration. Usually the defendant is sitting down by the time the jury comes in. If counsel wishes for the Court to instruct on that, we will instruct the jury.

"[DEFENSE COUNSEL]: Probably not, Judge. We might consider it.

"THE COURT: I really doubt the jury is aware of anything than the defendant may have a slight limp which may or may not rebound to his benefit."

Ninci appeals the trial court's ruling on this issue, alleging that physical restraint violated his right to a fair trial. Apparently, the leg brace was worn under Ninci's clothes. However, Ninci alleges

that the brace inhibited his mobility in such a way that the jury might have suspected he was restrained in some manner. For instance, Ninci contends that he was required to move around in front of the jury during the testimony of Nage Damas. However, the amount of movement Ninci was required to make during this testimony is not clear from the record. All the defense counsel said during Damas' testimony regarding the movement was: "I was going to have my client move over so that he can get a better look."

Ninci points out that courts have generally held a defendant has a right to appear before a jury free of shackles or other restraints because such restraints present an unacceptable risk of prejudicial effect. See *Holbrook v. Flynn*, 475 U.S. 560, 570, 89 L. Ed. 2d 525, 106 S. Ct. 1340 (1986); *Kennedy v. Cardwell*, 487 F.2d 101, 104-08 (6th Cir. 1973) (finding shackling, as a last resort, was not an abuse of discretion in the case), *cert. denied* 416 U.S. 959 (1974); *United States v. Samuel*, 431 F.2d 610, 614-15 (4th Cir. 1970), *cert. denied* 401 U.S. 946 (1971). To prevent such risk and implement the presumption of innocence, "courts must be alert to factors that may undermine the fairness of the factfinding process. *Estelle v. Williams*, 425 U.S. 501, 503, 48 L. Ed. 2d 126, 96 S. Ct. 1691, *reh. denied* 426 U.S. 954 (1976). In contravention of these cases, Ninci was compelled to wear a leg brace which, according to Ninci, created an unacceptable risk of prejudicial effect and compromised his presumption of innocence. As such, Ninci alleges that he was denied a fair trial. Since "the right to a fair trial [in a criminal case] is a fundamental liberty secured by the Fourteenth Amendment," Ninci asserts that his conviction must be reversed and the case remanded for a new trial. *Estelle*, 425 U.S. at 503; *Drope v. Missouri*, 420 U.S. 162, 172, 43 L. Ed. 2d 103, 95 S. Ct. 896 (1975).

The defendant has the burden of furnishing a record which affirmatively shows prejudicial error occurred in the trial, and absent such a record, the reviewing court assumes the trial court's action was proper. *State v. Gonzales*, 245 Kan. 691, 699, 783 P.2d 1239 (1989). Ninci presented no evidence that the jury knew he was wearing a leg brace, or that the jury detected his slight limp, or that the jury knew his limp was caused by a leg brace, or that the

jury knew the leg brace was on for restraint reasons instead of for medical reasons. Thus, the State asserts that this court should assume the trial court's action in allowing the use of the leg brace was proper and affirm the trial court's ruling.

The leg restraint in this case was so unobtrusive that it is not even clear the jury noticed it. Since the restraint was not inherently prejudicial, Ninci was required to come forward with some evidence indicating the jury at least noticed the leg brace or knew it was a restraint.

In this case, the trial court relied on the deputy's decision in allowing the use of the brace. It is the trial judge's ultimate responsibility to assure a fair trial to the accused. The trial court did make an independent analysis that the leg brace was unobtrusive. Thus, without specific evidence of prejudice, the court allowed the brace. The trial court did not abuse its discretion, and its ruling on this issue is affirmed.

## X. CUMULATIVE ERRORS

Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant. *State v. Lumbrera*, 252 Kan. 54, Syl. ¶ 1, 845 P.2d 609 (1992).

Our examination of the record convinces us there is no reversible error in this case, whether the claimed error is considered singularly or cumulatively.

## XI. DOUBLE JEOPARDY

Ninci was convicted of first-degree felony murder based upon the underlying felony of robbery or aggravated burglary. He received a life sentence for the first-degree felony murder conviction. Ninci was also separately convicted of robbery and aggravated battery. He received a sentence of 5 to 20 years' imprisonment for each of these felonies, to run consecutive to the life sentence. According to Ninci, the convictions and sentences for these two fel-

onies, on top of his conviction and sentence for felony murder, violated the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights. Ninci also contends that these three separate convictions violate K.S.A. 21-3107(2)(d), which precludes punishment for a crime necessarily proved (robbery or aggravated battery) if the crime charged (felony murder) is also proved.

K.S.A. 21-3107(2)(d) provides:

"Upon prosecution for a crime, the defendant may be convicted of either the crime charged or an included crime, but not both. An included crime may be any of the following:

. . . .

". . . A crime necessarily proved if the crime charged were proved."

A violation of the prohibition against double jeopardy is a question of law, and this court's review is de novo. *State v. Holt*, 260 Kan. 33, Syl. ¶ 5, 917 P.2d 1332 (1996).

This issue has been previously addressed in *Gonzales*, 245 Kan. 691. Ninci acknowledges the holding in *Gonzales*, but contends that *Gonzales* was incorrectly decided. Ninci asserts that the felony-murder doctrine is not independent from the lesser included offense rule set out in 21-3107(d) because felony-murder is not specifically excepted from K.S.A. 21-3107. See *Whalen v. United States*, 445 U.S. 684, 686, 63 L. Ed. 2d 715, 100 S. Ct. 1432 (1980) (Double Jeopardy Clause precludes federal courts from imposing consecutive sentences for felony murder and underlying crime) (discussed in *Gonzales* but distinguished). According to Ninci, K.S.A. 21-3107 precludes convictions and multiple punishments for lesser included offenses; thus, his convictions and sentences for robbery and aggravated burglary must be set aside.

*Gonzales* was decided in 1989. The issue in *Gonzales* was revisited as recently as 1996 in *Holt*, 260 Kan. 33. *Holt* affirmed the holding in *Gonzales*.

In *Holt*, the defendant asserted that his convictions for first-degree felony murder and the underlying felony violated the United States Constitution prohibition against double jeopardy. In analyzing the issue, this court stated:

"The defendant acknowledges that the Kansas Legislature intended to allow conviction and punishment for both felony murder and the underlying felony, but he claims that the imposition of consecutive sentences for his convictions of first-degree murder and the underlying felonies violates the United States Constitution prohibition against double jeopardy. A violation of the prohibition against double jeopardy is a question of law, and this court's review is de novo.

"The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution provides that no person shall be subject to be twice put in jeopardy of life or limb for the same offense. The Clause is enforceable against the states via the Fourteenth Amendment. *North Carolina v. Pearce*, 395 U.S. 711, 717, 23 L. Ed. 2d 656, 89 S. Ct. 2072 (1969). Equivalent double jeopardy protection is found in Section 10 of the Kansas Constitution Bill of Rights. See *State v. Cady*, 254 Kan. 393, 396-97, 867 P.2d 270 (1994). The Double Jeopardy Clause shields persons from '(1) a second prosecution for the same offense after acquittal, (2) a second prosecution for the same offense after conviction, and (3) multiple punishments for the same offense.' 254 Kan. at 396. At issue here is the third protection, that against multiple punishments for the same offense.

"The defendant acknowledges that it is the well-established law in Kansas that multiple convictions and punishments for both felony murder and the underlying felony are not violations of double jeopardy. See, *e.g.*, *State v. Gonzales*, 245 Kan. 691, 704, 783 P.2d 1239 (1989) (underlying felony of attempted rape); *State v. Dunn*, 243 Kan. 414, 433, 758 P.2d 718 (1988) (underlying felonies of aggravated kidnapping and aggravated robbery). The defendant contends, however, that these cases were incorrectly decided and requests this court to revisit the issue.

"In *Gonzales*, 245 Kan. at 704, this court recognized that resolution of the double jeopardy issue depends. on whether the Kansas Legislature intended to allow conviction and punishment for both felony murder and the underlying felony. The court held that the legislature, by not prohibiting the practice of multiple punishments for both felony murder and the underlying felony once it was aware of the practice, approved of the practice. 245 Kan. at 704-05. The *Gonzales* court also addressed an argument, similar to that of the defendant here, concerning the doctrine of lesser included offenses. The court stated:

'The flaw in defendant's argument is that he fails to recognize the distinction between the "lesser included offense" doctrine and the "felony-murder" doctrine. Each is a separate theory of law. Each exists in a distinct legal pigeonhole. . . .

'The appropriate test to apply to the instant case is found in *State v. Dunn*, 243 Kan. at 432-33, where the court stated:

"The constitutional prohibition against double jeopardy is directed to the identity of the offense and the act. Where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied when determining whether there are two offenses or only a single offense is *whether each statutory provision requires proof of an element that the other does not*. Where one statute [requires] proof of an element that the other does not, the crimes are not the same, even though proof of the separate crimes may substantially overlap.

. . . .

"We have held that the proper test for determining whether an underlying felony merges into a homicide is whether all the elements of the felony are present in the homicide and whether the felony is a lesser included offense of the homicide. If this is not true, then the felony must be a separate and distinct offense and the doctrine of merger does not apply. *State v. Rueckert*, 221 Kan. 727, 733, 561 P.2d 850 (1977). A more correct formulation of the proper test when considering merger is whether the elements of the underlying felony are so distinct from the homicide so as not to be an ingredient of the homicide. *State v. Lashley*, 233 Kan. 620, 631, 664 P.2d 1358 (1983)." 245 Kan. at 706-07.

"*Gonzales* and *Dunn* are not the only cases reaching this result. This court also concluded, following the *Gonzales* and *Dunn* analyses, that convictions for felony murder and the underlying felony did not violate double jeopardy in *State v. Johnson*, 258 Kan. 475, 905 P.2d 94 (1995) (aggravated kidnapping and aggravated robbery); *State v. Butler*, 257 Kan. 1043, 897 P.2d 1007 (1995), *modified on other grounds* 257 Kan. 1110, 916 P.2d 1 (1996) (aggravated robbery); *State v. Swafford*, 257 Kan. 1023, 897 P.2d 1027 (1995), *modified on other grounds* 257 Kan. 1099, 913 P.2d 196 (1996) (aggravated robbery); *State v. Sutton*, 256 Kan. 913, 889 P.2d 755 (1995) (aggravated kidnapping and aggravated robbery); *State v. Bailey*, 247 Kan. 330, 340, 799 P.2d 977 (1990), *cert. denied* 500 U.S. 920 (1991) (aggravated robbery); and *State v. Pioletti*, 246 Kan. 49, 785 P.2d 963 (1990) (aggravated kidnapping). The defendant has shown no compelling reason for us to depart from this well-established law and find that these cases were wrongly decided." 260 Kan. at 44-45.

The underlying felonies of robbery and aggravated battery require proof of elements that homicide does not require. Homicide (felony murder) requires proof of elements that these underlying felonies do not require. These are three distinct and separate crimes, and Ninci's conviction and sentence for each crime does not violate double jeopardy or K.S.A. 21-3107(2)(d).

We have examined all issues raised by Ninci, either through counsel or his pro se brief, and we do not find reversible error on any one issue or collectively.

Affirmed.